# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

---

| | |
|---|---|
| In re | **Jointly Administered under**<br>**Case No. 08-45257** |
| Petters Company, Inc., et al., | Court File No. 08-45257 |
| Debtors. | |
| | Court File No.: |
| (includes: | |
| Petters Group Worldwide, LLC; | 08-45258 |
| PC Funding, LLC; | 08-45326 |
| Thousand Lakes, LLC; | 08-45327 |
| SPF Funding, LLC; | 08-45328 |
| PL Ltd., Inc.; | 08-45329 |
| Edge One LLC; | 08-45330 |
| MGC Finance, Inc.; | 08-45331 |
| PAC Funding, LLC; | 08-45371 |
| Palm Beach Finance Holdings, Inc.) | 08-45392 |
| | Chapter 11 Cases<br>Judge Kathleen H. Sanberg |

---

| | |
|---|---|
| Douglas A. Kelley, in his capacity as the<br>Trustee of BMO Litigation Trust, | |
| Plaintiff, | |
| vs. | ADV. NO. 12-04288 |
| BMO Harris Bank N.A., as successor<br>to M&I Marshall and Ilsley Bank, | |
| | **JURY TRIAL DEMANDED** |
| Defendant. | |

---

## FIRST AMENDED COMPLAINT

---

87023705.4

Douglas A. Kelley, in his capacity as the Trustee of BMO Litigation Trust, by and through his legal counsel, as and for his claims against BMO Harris Bank N.A., as successor to M&I Marshall & Ilsley Bank ("M&I"), states and alleges as follows:

## OVERVIEW

This action arises out of a massive fraud scheme orchestrated by Thomas J. Petters ("Petters"), who bilked his victims out of billions of dollars. Petters and his principal co-conspirators, Deanna Coleman and Robert White, among others, devised a plan centered on the fictional purchase and sale of consumer electronics to big-box retailers like Walmart and Costco. Petters and his cohorts induced investors to advance funds purportedly to purchase merchandise that would then be resold to retailers at a profit. However, in reality, Petters diverted the investors' funds for other purposes, such as making payments to earlier investors, paying off those who assisted in the fraud, and financing Petters' extravagant lifestyle—a classic *Ponzi* scheme ("Petters Ponzi Scheme").[1]

Petters did not act alone. M&I was complicit in the scheme, presiding over the "small business" checking account—Account No. 1959018 (the "M&I Account")—through which nearly all of the $40 billion of the Scheme was laundered. M&I monitored and reviewed the activity in this account yet failed to intervene. Instead, M&I served as a critical lynchpin "legitimizing" Petters' plot and facilitating it. M&I had actual knowledge of Petters' fraud and acted in bad faith to provide substantial assistance, helping it flourish. Indeed, beyond Petters, Coleman, and White, no party

---

[1] A *Ponzi* scheme is generally recognized as a fraudulent investment operation that pays return to separate investors from their own money or from monies paid by subsequent investors, rather than from any actual profit earned. The scheme is named after Charles Ponzi, who became notorious for using the technique in early 1920.

87023705.4

knew more about the Petters Ponzi Scheme or was in a better position to put an end to it than M&I. Driven by its desire to gain more business from and make money on Petters and his companies, M&I engaged in a pattern of behavior that demonstrated its knowledge or willful ignorance of the Ponzi Scheme. In either case, M&I acted with bad faith in enabling the scheme to continue for years, costing innocent investors billions of dollars in the process.

Based on its desire to insinuate itself into Petters' everyday business and cross-sell its suite of banking services, a broad range of M&I personnel sought and learned the details of PCI's purported business plan and met frequently with PCI principals and employees. M&I then actively monitored the Petters, PCI, and related-entity accounts, looking for opportunities to provide additional services and bending over backward to accommodate questionable and suspicious Petters' requests.

Among its more egregious actions, M&I turned a blind eye when one investor formally asked M&I to confirm a $39 million balance in the M&I Account, as M&I knew that the real balance was just a fraction of that amount and that Petters personnel were misrepresenting the actual balance to the investor. M&I developed a special policy, specifically tailored to PCI, to deal with the routine outgoing wire requests by PCI for which there were insufficient funds in the M&I Account. For years, M&I ignored highly unorthodox requests from PCI's investors to monitor the activity in the M&I Account. Then, when M&I finally capitulated to the investor-demanded Deposit Control Agreements under which M&I formally assumed contractual and fiduciary duties, M&I did so with no intention of enforcing or even complying with the agreements bur rather merely to placate the investors. M&I also failed to act despite monthly Anti-Money Laundering alerts on the Petters accounts—eventually going so far as to *expedite* the process for reviewing and dismissing these alerts. Finally, well after being on notice of the

- 3 -

facts giving rise to this lawsuit, M&I intentionally destroyed emails and other relevant documents from pre-2005—one of the most critical timeframes in the case, when investors questioned PCI's activity in the M&I Account and M&I and Petters worked together to placate the investors.

Through it all, thanks to its intimate knowledge of PCI's claimed business and the reality of the transactions at its bank, M&I knew that the actual flow of funds through the M&I Account was inconsistent with representations made by Petters and his associates regarding their business model. While Petters assured investors that their investments were being repaid from monies received from large retailers, in fact, the monies PCI raised from defrauded investors were used to pay other investors. Not surprisingly, given the depth of its participation in the Petters fraud, M&I never confronted Petters about the lack of any big-box retailer participation in the underlying transactions or acted on its awareness of that fact and the inconsistency with PCI's purported business model.

Had M&I responded to this red-flag behavior by Petters and his companies as required by banking regulation, it would have shut down the Petters accounts—a simple move that most likely would have exposed the Petters Ponzi Scheme, avoiding substantially all of the losses caused by the Scheme and saving innocent investors billions of dollars. Instead, M&I did nothing to stop the Scheme—quite the opposite, as discussed in detail below. Accordingly, the BMO Litigation Trustee now brings this action to recover damages for M&I's knowledge of, willful indifference to, and bad-faith driven substantial assistance to the Petters Ponzi Scheme.

## PARTIES, JURISDICTION AND VENUE

1.    On October 3, 2008, pursuant to 18 U.S.C. § 1345, the United States District Court of the District of Minnesota (the "District Court") placed Petters Company, Inc. ("PCI"), a

corporation organized under the laws of the State of Minnesota, into receivership in response to

litigation commenced by the United States of America against, among others, Petters and PCI

(Court File No. 08-CV-05348) (the "Receivership Action").

2.      By Order of the District Court in the Receivership Action dated October 6, 2008,

as subsequently amended and restated on December 8, 2008, the District Court appointed

Douglas A. Kelley, Esq. ("Kelley") as equity receiver (the "Receiver") of any affiliates,

subsidiaries, divisions, successors, or assigns owned 100% or controlled by Petters, including

PCI.

3.      As the Court-appointed Receiver, Kelley serves as an agent of the District Court

and, in that capacity, had exclusive custody, control, and possession of the property, assets, and

estates of PCI. In that role, Kelley is charged with recovering assets for the creditors and other

victims of the Petters Ponzi Scheme. Significantly, Petters and his co-conspirators have not been

in control of PCI since the appointment of Kelley as Receiver, and Kelley's recovery of assets in

his role as Receiver is not for the benefit of Petters or any other perpetrator of the Petters Ponzi

Scheme.

4.      On October 11, 2008 (the "Petition Date"), PCI, at the Receiver's direction, filed

a petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy

Code") in Court File No. 08-45257.

5.      On October 22, 2008, this Court ordered the above-captioned Bankruptcy cases to

be administratively consolidated as *In re Petters Company, Inc., et al.*, under case number 08-

45257.

6.      On February 26, 2009, this Court approved the Office of the United States Trustee

for the District of Minnesota's appointment of Kelley, as the Chapter 11 Trustee for all Chapter

11 debtors in this jointly administered matter (the "Trustee"), which specifically included appointing Kelley as the Chapter 11 Trustee of PCI.

7.      On April 15, 2016, Judge Kishel confirmed the Second Amended Chapter 11 Plan of Liquidation [ECF No. 3305], which created, among other things, the BMO Litigation Trust relating to this litigation against BMO. This litigation includes causes of action directed at recovering lost investments made by investors whose funds were deposited in trust in the M&I Account for investment purposes and who are now beneficiaries of the BMO Litigation Trust. The BMO Litigation Trust is governed by the Court-approved BMO Litigation Trust Agreement.

8.      Under that Agreement, the BMO Litigation Trust is managed by the BMO Litigation Trust Committee and its Trustee, Douglas A. Kelley, was appointed Trustee of the BMO Litigation Trust.

9.      Paragraph 1.4 of the BMO Litigation Trust Agreement addresses "Title to BMO Litigation Trust Assets," and states that "[u]pon the transfer of the BMO Litigation Trust Assets [to the Trust], neither the Chapter 11 Trustee nor the Debtors shall have any interest in or with respect to the BMO Litigation Trust Assets or the BMO Litigation Trust . . . ."

10.     The Findings of Fact, Conclusions of Law, and Order Confirming the Second Amended Chapter 11 Plan of Liquidation Dated April 8, 2016, states further that "the BMO Litigation Trustee may dispose of the BMO Litigation Trust Assets free of any restrictions of the Bankruptcy Code, but solely in accordance with the provisions of the Plan and the BMO Litigation Trust." ¶12.

11.     The Plan has now gone effective. The BMO Litigation Trust is the owner of the causes of action and related assets of this litigation.

87023705.4

12.     M&I was a Wisconsin banking corporation that maintained an office in Hennepin County, Minnesota, at 651 Nicollet Mall, Minneapolis, Minnesota 55402. BMO Harris Bank, N.A. is the successor in interest to M&I.

13.     This Court has subject matter jurisdiction of this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334. The claims asserted herein arise under the Bankruptcy Code and are related to cases pending before this Court pursuant to the Bankruptcy Code.

14.     This adversary proceeding is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A) and (O).

15.     Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## I.      FACTUAL BACKGROUND

### Petters, Coleman, And White Conducted A Fraud Outside
### Their Employment Capacity And Of No Benefit To PCI

16.     This case arises from a massive fraud and Ponzi scheme designed and orchestrated principally by Petters, Coleman, and White. Petters, Coleman, and White were each officers and directors of PCI who owed the company and its investors a fiduciary duty that they breached through the Ponzi scheme until the date of Petters' arrest by federal agents in 2008. Throughout the course of their wrongdoing, Petters, Coleman, and White laundered proceeds of the Ponzi scheme estimated to be an amount in excess of $40 billion.

17.     Petters, Coleman, and White represented to various investors that the business of PCI involved the purchase and sale of goods to big-box retailers such as Walmart and Costco and the purchase-order and receivables financing of those transactions.

18.     PCI owned (except for one owned by Petters) and operated special purpose entities (the "SPEs"), which were formed specifically to receive funds from various investors who believed they were financing PCI's purchase order and receivables financing business.

Typically, investors would wire their funds to a dedicated SPE that would then forward the funds to one of two purported wholesalers. These "sham wholesalers" were Nationwide International Resources ("Nationwide") (operated by Larry Reynolds ("Reynolds")) and Enchanted Family Buying Company ("Enchanted") (operated by Michael Catain ("Catain")). Instead of purchasing goods with the funds, Reynolds, through Nationwide, and Catain, through Enchanted—in cooperation with Petters, Coleman, and White—fraudulently rerouted the funds back to PCI through the M&I Account after deducting a commission. Petters, Coleman, and White then transferred those funds from PCI to the SPEs, to other third-party entities controlled by Petters, or to themselves personally.

19.    Petters induced investors into financing the purchase of purported goods, with investments purportedly secured by purchase orders and potential future accounts receivable. Instead of procuring legitimate purchase orders from retailers to provide to investors, Petters, Coleman, and White, while acting adversely to PCI and the SPEs and outside their employment capacity, fabricated purchase orders in the dollar amounts necessary to pay earlier investors back with more recent investors' money and to keep the Ponzi scheme alive.

20.    To obtain many of the investors in the Ponzi scheme, Petters, Coleman, and White portrayed PCI or SPEs as middlemen that purchased consumer electronic goods or other goods from the sham wholesalers and resold the merchandise to large big-box retailers such as Walmart and Costco. Petters, Coleman, and White fabricated the documents necessary to recruit investors into the Ponzi scheme. Petters, Coleman, and White prepared and used fabricated documents that were represented to investors to be purchase orders and related documents. The fabricated documents typically included: (1) purchase orders from retailers to PCI purportedly ordering electronic goods for purchase from PCI; (2) purchase orders from PCI to the sham wholesalers,

purportedly ordering electronic goods, and (3) false invoices. Petters, Coleman, and White fabricated the quantity and prices on these documents to create the false appearance that the purported transactions actually resulted in profit.

21.    PCI and the affiliated SPEs experienced substantial losses and were in fact insolvent at all times. As a result of the fraudulent conduct of Petters, Coleman, and White, PCI and the affiliated SPEs received no benefit.

22.    The Ponzi scheme was massive in size—more than $3.8 billion of losses were incurred on a book basis. But the Ponzi scheme structure was also simple in operation. The funds were transferred in three simple steps. First, PCI or one of its SPEs would transfer funds to Nationwide or Enchanted. Second, Nationwide or Enchanted would deduct a commission and then transfer those funds to the M&I Account. Third, PCI, acting on instructions from Petters, Coleman, and/or White, would transfer funds to the SPEs, to other third party entities controlled by Petters, or to themselves personally. Step one represented the purported purchase of goods—though no goods were purchased. Step two represented the purported creation of accounts receivable—though no accounts receivable were created. Step three represented a purported repayment to investors from an alleged account receivable based on alleged legitimate business activity—though no business activity occurred. The bank statements and transaction reports of the M&I Account and the massive flow of funds shown in these documents reveal that none of the business activity described by Petters and his associates actually occurred. Moreover, they reveal the Ponzi scheme because they show, among other things, that no money was coming from any retailers.

23.    M&I has no defense of innocent ignorance. Whether required to or not, M&I in fact reviewed and studied the M&I Account activity extensively beginning in 2002 and possibly

earlier, including as a way to promote new products and to pitch new business to PCI and Petters. That review spanned across departments at M&I—from the banker managing the M&I Account, to his supervisors, to the credit department, to the Treasury management department, and all the way to M&I's corporate compliance department. M&I sought and gained, in a concerted effort among multiple M&I personnel, a detailed understanding of PCI and its activities in an effort to win more business from Petters. M&I failed, however, to use the information it learned in its own investigations to do what industry regulations demanded in response to the numerous red flags—to close the account and put the brakes on the massive money-laundering scheme.

### The M&I Account Was Used To Launder Ponzi Proceeds

24.    PCI opened a depository account with National City Bank in December 1999. In July 2001, M&I acquired National City Bank. PCI established a single checking account dedicated solely to PCI's fraudulent purchase order financing transactions—the M&I Account. Despite the tens of billions of dollars that would flow in and out of the M&I Account, the M&I Account was opened at a small M&I branch in suburban Minneapolis. On information and belief, throughout the entire fraud, the M&I Account was maintained as a "small business" account at that same branch office instead of being maintained in M&I's commercial banking or trust department, as multiple M&I personnel pointed out during the course of the fraud would have been the natural and more appropriate place for the account.

25.    After opening the M&I Account, billions of dollars were wired into and out of the M&I Account purportedly to facilitate PCI's purchase order financing transactions. No money was ever received from a big-box retailer, a fact clearly inconsistent with the business plan presented to M&I by the PCI team.

26.     The frenzied activity in the M&I Account was the telltale sign of a money laundering scheme, and M&I knew of these transactions. Deposits came into the account from the sham wholesalers and the investors—many of whom M&I had met when they sought assurances from M&I regarding money flows in the M&I Account. Amounts flowed back out of the account to these same sham wholesalers and investors, with a portion of the outflows (as in any Ponzi scheme) going to the individuals perpetrating it (here, Petters and his cohorts).

27.     M&I understood that the sham wholesalers were the businesses from which PCI purchased goods. Yet, a cursory review of the transactions in the M&I Account revealed that the sham wholesalers were in fact wiring billions of dollars *into* the M&I Account. In other words, PCI did not pay the sham wholesalers for the goods PCI purportedly bought. Instead, the sham wholesalers paid PCI. This account activity was illogical in light of M&I's understanding of PCI's business.

28.     Nowhere in the flurry of billions of dollars in and out were the promised transactions with big-box retailers, or any retailers for that matter. M&I reviewed and studied the activity in the M&I Account and was therefore aware of the glaring absence of retailer transactions. The sham wholesalers were not the big-box retailers that Petters had repeatedly touted to M&I as his customers, household names like Walmart and Costco, but rather small, otherwise unknown shell entities, one of which was "headquartered" out of a car wash in suburban Minneapolis.

29.     According to the U.S. Department of Justice, it was when the sham wholesalers got involved—in and about the time M&I began overseeing the M&I Account it had inherited from National City Bank—that the money-laundering scheme "went from a <u>million</u> dollar fraud to a <u>billion</u> dollar fraud."

87023705.4

30.    Throughout its relationship with Petters, rather than questioning the suspicious activity it observed, M&I focused on expanding its relationship with PCI and its affiliates and selling more products and services to PCI and its affiliates to increase M&I's profits. To facilitate this selling effort, M&I sought and gained intimate knowledge about the activity in the M&I Account and PCI's purported operational structure and borrowing and selling relationships.

31.    After the account was opened, M&I banker Edward Jambor ("Jambor") was assigned day-to-day responsibility for managing the Petters relationship and overseeing the M&I Account.

32.    Following the acquisition of National City Bank by M&I, the roles of the bankers primarily responsible for the PCI relationship migrated, in the words of the primary banker, into roles with M&I involving "business development" and "proactive sales." As such, expanding the relationship with Petters, PCI, and affiliates become a significant focus of the M&I banking team.

33.    As they tried to do so, M&I personnel gained detailed information regarding PCI's borrowing relationships, including through numerous in-person and telephonic meetings with representatives of PCI's investors, receipt and review of examples of the PCI's borrowing documents, and extensive direct interaction with PCI's investors. This also included knowledge of PCI's purported big-box retailer customer relationships (including examples of PCI's purchase orders from these retailers). Most significant, this knowledge included a detailed understanding of the supposed flow of funds in PCI's business: from investor to PCI (or the SPEs) to the sham wholesaler, and then from the big box retailer purchasing the merchandise to PCI to the relevant investor. M&I understood that all of this purported activity was supposed to be flowing through the M&I Account.

- 12 -

34.     In support of M&I's marketing efforts, M&I bankers and other representatives met with PCI representatives, including Coleman, on a regular ongoing basis to learn and understand the business and needs of PCI.

35.     Beginning in the fall of 2002 and continuing through the end of 2003, M&I conducted at least 12 in-person meetings with Petters, Coleman, White, and other Petters representatives regarding PCI's business. These meetings involved M&I's primary relationship manager for PCI as well as other senior M&I personnel. In addition, M&I conducted numerous documented telephone conferences involving these same PCI and M&I representatives. By M&I's own admission, nearly all of these in-person meetings and documented telephone calls were "substantial interactions" where PCI's business was "discussed in an in-depth and meaningful way." In addition, upon information and belief, there were substantially more in-person meetings and phone conversations between representatives of PCI and M&I during this timeframe.

36.     For example, in September 2002, M&I's Vice President for Treasury Management Services, Kevin Pleasant ("Pleasant"), met with Coleman regarding PCI's banking activities. At the time, M&I knew that PCI had been conducting an extraordinary volume of wire transfers through the M&I Account, and Pleasant noted the "large volume of wire activity" in the M&I Account in his notes from the meeting. From January 1, 2002, to September 30, 2002, approximately 1,267 wire transfers were transacted through the M&I Account, with deposits of $1,280,235,245 and debit transactions totalling $1,280,770,691. Throughout this period, the M&I Account also experienced substantial fluctuations in daily balance because tens of millions of dollars were transferred in and out of the M&I Account on a daily basis.

37.    In September and October 2002, Jambor, along with two other M&I representatives, met with Petters and Coleman on several occasions to gain a better understanding of PCI's business model. Jambor's written call report from the October 16, 2002 meeting states, among other things, "[Jambor] met with Deanna to present our proposal for more efficient management of the wire transfer activity and management of their excess cash . . . . Also, [we] inquired with Deanna on where exactly all of their banking relationships (from a deposit perspective) were at this time . . . ." Regarding an October 31, 2002 meeting with Tom Petters, Jambor wrote: "Kevin and I met with Tom to get a overview of Petters Company . . . ."

38.    Other M&I documents reflect M&I's view that the Petters Relationship was "important" and "substantial" given the "high activity." Jambor's own written notes reflect his understanding that "there were large amounts of money going through the [M&I Account]" and that the M&I Account had "frequent" and "a lot of" wire transfers.

39.    In July 2003, Jambor and M&I banker Barbara Nieland met with Rich Menczynski, a Petters employee, who claimed that PCI did $1.3 billion in annual sales, made $60 million in annual net income, was financed by several private investors, paid some of its investors an interest rate as high as 36%, and held no merchandise in inventory, but rather immediately "flipped" it to a retailer. This description was yet another example of a representation of Petters' business model that was inconsistent with the flow of funds that M&I observed on a daily basis.

40.    Around this same time, M&I made a specific request for financial statements from PCI. PCI refused to provide them, even though Petters was willing to provide personal financial information and information regarding his other companies. This was another major red flag, as admitted by one of the M&I bankers responsible for the PCI relationship, who cannot

recall ever encountering a client (other than PCI) that refused to provide requested financial statements.

### M&I Learned The "Business" Of PCI From Frank Vennes

41.     M&I also gained actual knowledge about PCI and its purported business operations through other means. For example, in March 2002, M&I banker Christopher Flynn ("Flynn") met with Frank Vennes at Vennes' lakefront home regarding his company Metro Gem, Inc. ("Metro Gem") and to discuss Vennes' request that M&I loan money to Metro Gem to fund PCI's purchase order-financing transactions with retailers such as Costco and Walmart.

42.     At this meeting, it was disclosed to M&I that: (i) Metro Gem financed numerous purported PCI purchase order financing transactions; (ii) the merchandise typically included televisions and appliances; (iii) the typical value of each deal ranged from $2.5-3.5 million; (iv) all transactions were pre-sold by PCI to a retailer, including specifically Walmart and Costco; (v) after PCI was paid by the retailer, PCI used those funds to pay back Metro Gem; (vi) Metro Gem's loan to PCI was secured by a lien on the goods financed; and (vii) PCI borrowed from private investors rather than banks.

43.     Also at that meeting, Vennes explained that Petters' relationships with the retailers were particularly valuable and that Petters offered the retailers discretion. A well-known retailer such as Walmart could suffer repercussions if Walmart's traditional suppliers learned it was buying merchandise from sources other than directly from the supplier. Vennes further explained that PCI did not take possession of the inventory, instead arranging for shipping directly from PCI's supplier to the retailer.

44.     After the meeting, Flynn had a clear understanding regarding the structure of PCI's purported purchase order financing transactions. In fact, Flynn's written call report states

among other things, "All financed transactions are based on pre-sold merchandise to various relaters such as Wal-Mart, etc.…the niche they have available is due to the potential negative signal to the markets that would be created if a publicly traded firm (Sony) were to arrange for an oversupply of inventory (at a substantial discount) with a publicly traded retailer such as Wal-Mart. This arrangement would also have negative consequences for the retailer's relationship with its supply chain." Flynn was even provided with copies of the underlying loan documents that would support a typical transaction, including a note, security agreement, and purchase orders from a supplier to PCI and from PCI to a retailer.

45.    Following the meeting, Flynn prepared a "Pre-Screen" memorandum detailing Vennes' description of PCI's purported business model. As a result of the meeting, Flynn had a clear understanding of PCI's business model and the fact that retailers such as Wal-Mart were supposed to be making payments to the M&I Account as part of the purchase order financing transactions.

## M&I Sought Additional Business From Petters

46.    Flynn later assumed responsibility for the Petters' relationship:

> Q.    Okay. Who made the decision that you would take over the Petters relationship?
>
> A.    I did
>
> Q.    Okay. And why did you make that decision?
>
> A.    It was a big account.
>
> * * *
>
> Q.    It was a big account in what respect? What was big about it?
>
> A.    It was a large deposit account, and there appeared to be other opportunity there.

Q.      What other opportunity?

A.      More business.

Q.      What type of business?

A.      It could be anything connected with banking or financial services.

Flynn Dep. Tr. 93:12 – 94:4. Sept. 21, 2010.

47.    Jambor and numerous other M&I bankers regularly met with other PCI representatives to solicit additional business from Petters and other companies he controlled. M&I believed that "the more you can understand about your customer, the better you are in developing the relationship." In furtherance of that objective, Jambor and other M&I bankers worked consistently to find new ways to develop business with Petters. For example, in October 2002, Jambor and another M&I banker met with Coleman and made a "proposal for more efficient management of wire transfer activity and management of their excess cash." Similarly, in March 2003, Jambor and two other M&I bankers met with PCI employees White and Stuart Romaneski because PCI "wanted to begin coordinating bank relationships and have been more than pleased with our service." Jambor considered PCI to be one of his "top customers" in terms of deposits, lending relationships, cross-sells, and cash management products. In July 2003, three M&I bankers – not including Jambor—met with PCI employee Rich Menczynski to solicit more business from the Petters companies. As part of that conversation, Menczynski explained in detail the Petters group of companies, including how their alleged financing transactions worked.

48.    Around the time that Petters was buying Polaroid, M&I attempted to persuade Petters to use M&I to close the transaction. On January 12, 2005, Douglas Howe, an M&I Vice President, sent an email to four other M&I bankers forwarding an article regarding Petters' purchase of Polaroid. Hank Donatell, a Vice President and Controller, responded stating, "Talked

87023705.4

with [Jambor] this morning. Apparently, Polaroid is skeptical now about having Petters utilize M&I to settle this transaction. They have stated a preference for Petters to utilize a national vs. regional bank. A bunch of b.s. is [sic] you ask me. *[Jambor] is in daily contact with them* so hopefully we will still get the deal and given the press release, it must be getting close. Will keep you in the loop on any further developments we become aware of." (Emphasis added.)

49.     In 2007, M&I banker Flynn met with a handful of PCI employees about several banking opportunities. Following the meeting, Flynn emailed Jeanne Crain, Executive Vice President of Business Banking for the Minnesota Region, and explained: "Some large $ opportunities, can't assess their quality yet but will be setting up intro meeting . . . ."

50.     In addition to handling the M&I Account, M&I Bank also had a banking relationship with Petters personally. In 2007, Petters took a personal mortgage loan from M&I encumbering his home in Wayzata in the amount of $946,500.00.

**M&I Had Actual Knowledge Regarding PCI's Purported Business Model**

51.     M&I representatives met regularly—at least quarterly—with PCI to discuss formally the M&I Account, usually at PCI's offices. M&I considered its relationship with Petters to be important and substantial given the high activity in the account. Based on its dealings with PCI and numerous and ongoing meetings with PCI representatives, M&I understood PCI's purported business model, including that PCI was receiving funds from investors purportedly to finance purchase order financing transactions, which generated the frenzied wire activity in the M&I Account.

52.     M&I also learned that issues arose in connection with the movement of funds in the transactions.

53.     For example, although investors understood that payments for the merchandise in the purchase order financing transactions were supposed to be made directly from the big box retailer to the particular investor's SPE that funded the purchase order financing transaction, the funds were instead being remitted to the M&I Account by the sham wholesalers, not by any retailers. PCI then sent the funds to the SPEs.

54.     When asked by investors about why retailers were not directly making payments on these transactions to the SPEs, Petters, Coleman, and/or White represented that the retailers were unwilling to issue payments to multiple investors directly, but instead, would only direct payments to PCI.

55.     As described further below, M&I was well aware of these false representations that Petters, Coleman, and White routinely made to investors yet did nothing.

**Investors Asked M&I For Deposit Control Agreements**

56.     Because Petters refused to permit investors to transact business or communicate directly with his purported retailer customers, some investors suggested an arrangement by which M&I would control the disbursement of funds from the M&I Account. By having M&I control disbursements, investors purportedly could ensure that Petters would not misuse retailer payments.

57.     In early 2003, M&I stepped into these discussions and understood from direct meetings with Petters that (i) retailers refused to pay investors directly and insisted that all payments continued to be wired directly to the M&I Account, and (ii) PCI was holding these funds in trust for the benefit of its investors and the particular deal(s) they financed.

58.     Multiple Petters investors contacted M&I to see if it would agree to exercise control over the M&I Account and ensure that their purported earmarked retailer payments were

properly routed in light of the retailers' insistence that their payments be sent to PCI directly through the M&I Account.

59.     In early 2003, a PCI investor inquired with M&I and proposed an arrangement whereby M&I would forward retailer payments wired into the M&I Account to the investor's account based on a weekly or monthly transaction list to be provided by Coleman. The transaction lists were to contain information relative to the deals financed, including the retailer making the payment. During the meeting, M&I employee Shari Rhode stated that M&I would not perform such a function.

60.     What the investor did not know was that the proposal had been rejected before the meeting even took place. *Before* the meeting, Coleman told M&I that PCI merely wanted to placate the investor by having the meeting with M&I officers but had no intention to enter into the proposed arrangement. M&I participated in this charade, knowingly assisting PCI in making false representations to an investor to bolster the Petters relationship and to give a false impression of legitimacy.

61.     After the meeting, this investor emailed Jambor and Rhode to follow-up and find out what solutions M&I could offer to solve the investor's issues that all retailer payments were all flowing into the M&I Account. On February 27, 2003, Jambor wrote to Coleman expressing "how much I enjoy working with you and value the relationship Petters Company has with M&I." Jambor indicated that any solution to the investor's problem would require the opening of a new account and the assignment of a new account number. Shortly after Jambor sent this email, the investor emailed Petters' outside counsel and stated that any solution that would ensure funds would not be misappropriated from the M&I Account was "dead" because M&I insisted upon

"changing the bank account number of the Petters account which currently receives all retailer payments."

62.    In May 2003, a different investor met with Coleman, Petters, and Jambor at PCI's offices in Minnetonka, Minnesota. At the meeting, the mechanics of PCI's purchase order financing transactions and the supposed flow of money in and out of the M&I Account were explained. The investor then e-mailed Jambor and Shari Rhode along with PCI's outside counsel, Simon Root, confirming that the investor was looking for M&I Bank to act as custodian to receive retailer wire payments and to forward those monies on to the appropriate bank accounts, a process purportedly already occurring every day through the M&I Account. Attached as Exhibit A, and incorporated herein by reference, is a copy of the e-mail that the investor sent to Jambor and Rhode.

63.    M&I then received a draft preliminary outline of an agreement that PCI indicated was for all of its investors. M&I gave the draft agreement to its legal counsel, Elliott Berman, of Godfrey & Kahn, S.C. ("G&K") to review. Mr. Berman had eighteen years of legal experience in the areas of banking regulation, banking compliance, and anti-money laundering.

64.    M&I rejected this investor's proposal.

65.    Around the same time, yet another investor's counsel sent a letter to an operations officer at M&I, Carolyn Moline ("Moline"), enclosing a proposed form of a deposit control agreement with M&I. Attached as Exhibit B and incorporated herein by reference is a copy of the letter. The letter stated, among other things, that many dollars were running through the M&I Account that should have been deposited into other lockbox accounts.

66.    M&I rejected this investor's proposal.

67.     The unorthodox and suspicious nature of these investor requests and the extensive investor interactions with M&I cannot be overstated. Each of the investors came to M&I at approximately the same time with the same message and request: it was their money in the M&I Account; Petters was giving them an excuse as to why big-box retailers were paying PCI through the M&I Account rather than paying the SPEs directly; and they wanted M&I to verify his explanation. Regardless of whether M&I formally agreed to these investors' requests, the mere fact they were made should have prompted M&I to review the M&I Account. M&I was in a unique position to do just that yet repeatedly failed to expose Petters' explanation as a lie.

68.     In any event, based on the substantial amount of due diligence it conducted on PCI, including without limitation its regular meetings with PCI personnel, M&I had actual knowledge that all monies in the M&I Account were being held pursuant to a fiduciary duty that Petters, Coleman, and White owed as officers and directors to PCI and to the investors whose funds had been deposited in trust in the M&I Account.

**M&I Had Actual Knowledge That Retailers Were Not Making Payments To PCI**

69.     While the M&I Account was used to launder billions of dollars by concealing the ownership, source, and location of the funds, the daily average balance in the account was often less than $1 million. Tens of millions of dollars, frequently in large whole dollar amounts, were transferred into the account and then immediately wired out that same day.

70.     During its relationship with Petters, thousands of records were created relating to the activity in the M&I Account. None of these records, however, reflected that a retailer was the source of monies being deposited in the M&I Account as contemplated by the structure of the PCI purchase order financing transactions as explained to, and understood by, M&I. This flow of

- 22 -

funds directly contradicted M&I's understanding as to how the funds were supposed to flow into the account, yet M&I chose to ignore that contradiction.

71.     From January 1, 2003, through August 31, 2008, in excess of the astronomical sum of $35.3 billion was deposited into the M&I Account (belying Menczynski's statement that PCI's annual revenues were a mere $1.3 billion). Of that, over $24.1 billion, or 68.3%, was received from two sources: Nationwide and Enchanted, the sham wholesalers. There were no deposits from retailers at any point. There is no valid business reason for such a staggering amount and percentage of transfers to be received from two entities that were purportedly selling merchandise to PCI, while PCI's retailers, to whom PCI supposedly sold the merchandise, made no transfers to PCI at all. An additional $10.7 billion, or 30.3%, was received from investor-related sources. M&I never sought, nor was it ever provided, a valid business reason for such a large amount of deposits from investors. Thus, at least 98.6% of the over $35 billion deposited during this less-than-six-year period was sourced from the sham wholesalers or from investors.

72.     During the same period, in excess of $35.3 billion was transferred out of the M&I Account. Of that amount, in excess of $34.2 billion, or 96.9%, was transferred to or for the benefit of investors.

73.     For the period January 1, 2003, through August 31, 2008 (shortly before the fraud collapsed), 68.3% of the monies in the M&I Account were sourced from Nationwide and Enchanted and from PCI's investors; over 96.9% of the monies in the M&I Account were used to fund payments to investors. This activity was not only facially illogical, but it conflicted with the information about PCI and the structure of its purchase order financing business that had been provided to M&I.

74.     During this same period, in excess of $68.4 million was transferred from the M&I Account directly or indirectly to Petters' personal accounts. On at least 17 different occasions, the transfers to Petters' personal accounts exceeded $1 million, including transfers of over $3 million on November 17, 2003, $5 million on December 13, 2004, $8 million on February 17, 2006, and over $11 million on October 27, 2006.

75.     The transfers to Petters' personal accounts are facially illogical given the stated purpose of the M&I Account. M&I never sought, nor was it ever provided, a valid reason for these transfers.

76.     During this same period, in excess of $119.2 million was transferred from the M&I Account to Petters Group Worldwide, LLC ("PGW"), a separate entity owned by Petters. In addition, $2.49 million was transferred from the M&I Account to Thomas Petters, Inc. ("TPI"), another separate entity owned by Petters.

77.     The transfers to PGW and TPI are facially illogical given the intended purpose of the M&I Account. M&I never inquired, nor was it ever provided, a valid reason for these transfers.

78.     Accordingly, M&I knew that PCI was not receiving monies from retailers and that the majority of the dollars deposited into the M&I Account were sourced from Nationwide and Enchanted, PCI's sham wholesalers, a fact that contradicted the explanations provided to M&I as to how PCI's business operated, and contradicted how PCI represented its business model to its investors. M&I knew that the representations made by Petters, Coleman, and White to PCI's investors regarding how PCI's business model operated were false.

87023705.4

79.     M&I also knew that at least one potential third party investor interested in transacting business with an SPE was misinformed that there were tens of millions of dollars sitting idle in the M&I Account.

80.     On Friday, December 5, 2003, Mark Apostalon, Compliance Officer at C.J.M. Holding Corporation ("Apostalon"), e-mailed Jambor an authorization permitting M&I to confirm that PCI had $39,250,000.00 in available funds to facilitate the purchase of 100,000 cell phones. The authorization was signed by Steve Ratliff, a Petters Consumer Brands, LLC employee who owned a separate entity called Integrity Marketing and Sales, LLP. Attached as Exhibit C, and incorporated herein by reference, is a copy of the e-mail and authorization that Apostalon sent to Jambor dated December 5, 2003.

81.     On December 5, 2003, PCI had an opening balance of $1,672,681.59 and an ending balance of $5 million in the M&I Account. At no point in December 2003 did PCI's closing daily balance approach $39 million.

82.     After receiving this email from Apostalon, Jambor forwarded it to Coleman on Monday, December 8, 2003, without including any text in his own forwarding email. Despite knowing something was radically wrong and illegitimate with the manner in which PCI was conducting its business, Jambor failed to request or receive an adequate explanation about the misrepresentation made to Apostalon regarding the M&I Account balance.

83.     After receiving the email from Jambor, Coleman forwarded it to, among others, Tom Petters, criticizing Ratliff for signing the authorization without approval and noting that, sending such letters "ruin's [s] our relation and the trust we have with our banker."

84.     M&I recklessly ignored the glaring red flag of the Apostalon incident and the real-time evidence it had of PCI's misrepresentations, once again signaling its bad-faith acceptance of and participation in the Scheme.

### M&I Ignored Alerts Of Unusual Activity In The M&I Account And Even Created A Special Exception Policy For Petters

85.     Many M&I employees were constantly monitoring the substantial activity in Petters' accounts at M&I, and regularly corresponded regarding the activities. On March 1, 2005, for example, Donatell emailed Jambor and inquired regarding Petters: "Moved $28 million into the Bank on Friday into Euros. Any idea what this may have been the result of and how long can we anticipate it to be here?" That same day, Jambor responded: "The way they move money probably not long. I see the account is down to $10 million this morning, a few wires have gone out to bring the balance to $3.3 million as of 10:00 AM." Similarly, on September 9, 2005, Donatell again emailed Jambor stating, "Ed – Noticed Petters balances are down about $12 million in average collected from July to August. How much of this decline is DDA and can we expect to get the balances back?" Jambor and Donatell then exchanged several emails discussing the activity in the account, with Jambor concluding, "The Petter [sic] checking account is in a Euro Sweep, which has a peg balance of $1.2 million. The balance really fluctuate [sic] over the sweep amount on a daily basis based on the sales and purchases of merchandise."

86.     M&I employees frequently initiated wire transfers on behalf of the Petters companies. For example, in May 2006, a Petters employee emailed Ann Benson requesting that a $1.5 million wire be transferred from one account into PCI's M&I Account—a request that itself was inconsistent with PCI's entire business model. Benson responded that same day stating: "The wire was received yesterday. I will transfer the funds for you today. Will you be needing to wire out any of those funds from Petters Company, Inc. today?"

87.    Besides these ad-hoc inquires and common monitoring of the account activity, M&I also had alerts in place that would monitor any unusual activity and require a response. For example, M&I would monitor all accounts on a weekly basis for, among other things, customers who had a net decrease in deposit balances of $1 million or more. On more than one occasion, this report listed Petters' accounts, and on each occasion, Jambor was required to respond explaining the basis for the activity in the account. For example, the report listed Petters Capital for the week ended July 22, 2005, because it had an account fluctuation of almost $1.5 million. Jambor responded, "The money was wired in one day and wired to another Petters account the next day."

88.    M&I also monitored Petters' accounts for issues related to overdrafts. For example, in 2006, several M&I bankers, including Jambor, had an exchange regarding what to do with the Petters Company account if it was overdrawn. Aarif Leung, a Money Transfer Systems Specialist in M&I's I-Money Transfer Center, requested that Jambor send a memo regarding how to handle overdrafts in the account. Ann Benson, another M&I banker, responded on Jambor's behalf, and explained Jambor's "policy" addressing this apparently common problem: "In [Jambor's] absence, allow me to relay to you in writing the policy that he follows regarding outgoing Petters wire transfers is that if the funds are not available. If funds ae [sic] not available in any Petters accounts at the time the wire is initiated by the customer, will the MTC please continue to check the account for availability throughout the end. If the funds never become available that day, the MTC may cancel the wire transfer request and do not need to contact the customer."

89.    M&I's special policy for PCI and the M&I Account dramatically mitigated the prospect of overdrafts, notwithstanding that PCI routinely requested M&I to wire amounts out of

- 27 -

the M&I Account at times when there were insufficient funds in the M&I Account. The effect of this special policy designed to accommodate PCI's routine delinquency was profound. Fewer overdrafts resulted in less scrutiny and avoided raising additional red flags on the M&I Account.

90.     The constant monitoring of the M&I Account outlined above is separate and in addition to M&I's Anti-Money Laundering/Bank Secrecy monitoring system, which is detailed in the section that follows.

**The M&I Account Triggered Continuous Anti-Money Laundering Alerts**

91.     The Bank Secrecy Act ("BSA") requires banks to assist U.S. government agencies to detect and prevent money laundering and file reports of suspicious activities that might signify financial crimes. At all material times, M&I knew that money laundering is the process by which criminals conceal the existence, nature or source of illegal funds and disguise them to make them appear legitimate. M&I understood that the BSA was amended by the USA Patriot Act to enhance the prevention, detection, and prosecution of money laundering and financial crimes. Through at least 2004, M&I monitored accounts by conducting manual reviews of printed account activity.

92.     By 2005, M&I established an Anti-Money Laundering ("AML") Monitoring Group charged with detecting, reviewing, and investigating unusual customer activity as part of M&I's obligations to comply with the BSA and other federal regulations. M&I's AML department created and implemented a set of guidelines, policies and procedures, and training materials to facilitate the bank's fulfillment of these obligations. M&I was thus monitoring Petters' accounts in two respects, with bank employees such as Jambor and many others in the Minnesota branch where the M&I account was located constantly monitoring the account on the "front end" and with the bank's AML department constantly monitoring the account on the

"back end" (specifically for fraud and anti-money laundering activities). As a result, there were literally scores of M&I employees who were consistently monitoring and aware of the specific wire activity in the M&I Account.

93.     As part of its monitoring activities, M&I implemented an automated computer system called Searchspace that would monitor accounts and trigger an alert if an account met certain indicia of fraud or money laundering. Searchspace monitored activity in depository accounts, including: (i) every transaction posted to a deposit account; (ii) all wire activity; (iii) customer demographic information from M&I's Customer Information System; and (iv) detail on customer deposit transactions.

94.     In addition, M&I used a module that allowed it to monitor wire transfers to other banks where M&I was the originator or recipient in order to identify unusual or suspicious patterns of activity and to detect common characteristics of originators and beneficiaries of wires.

95.     Through a scoring system, Searchspace determined whether to warn M&I's AML Monitoring Group about a depository customer's suspicious activity.

96.     From 2005 through 2008, the M&I Account continuously triggered AML alerts. The AML alerts occurred every 60 days from 2005 until the government raid in September 2008, each time necessitating an AML investigation by M&I's AML Monitoring Group. Upon information and belief, the transfer of tens of billions of dollars to and from the same tight circle of transferors and transferees via a single bank account at a local branch triggered M&I's anti-money laundering program. Upon information and belief, the number of indicators of fraud and money laundering generated by the M&I Account was consistently about 3 times higher than the minimum necessary to trigger the alerts.

87023705.4

97.    Once the AML alerts were triggered, M&I investigated the activity in the M&I Account. The investigations were conducted and memorialized by specially trained bank employees who reviewed the volume of the deposits, the sources of major deposits, the volume of ongoing transfers, and the major recipients of ongoing transfers. This activity was then compared to and considered with other data, within and outside the bank's own records, to ensure that M&I understood the activity in the M&I Account.

98.    As part of each investigation each time an alert was triggered, a specific M&I employee would investigate the account activity and would specifically review the source of all wire and check activity, both incoming and outgoing. These investigations included an inquiry regarding the identity of parties wiring in funds and the identity of parties receiving outgoing wires. M&I would then compare this data to the other information known to M&I about PCI's business.

99.    From February 2005 through July 2005, G&K lent Mr. Berman to M&I to serve as M&I's AML Monitoring Group Manager. In April 2005, Mr. Berman reviewed the March 2005 AML alert generated by, among other things, the extraordinary volume of incoming and outgoing wire activity within the M&I Account. Mr. Berman then performed the first of M&I's AML investigations of the M&I Account. Mr. Berman noted that incoming wire transfers came from Petters' co-conspirators—Nationwide and Enchanted, the sham wholesalers—with no wires coming from any retailers, such as Walmart or Costco. The information discovered in this very first investigation directly contradicted what M&I knew PCI had represented repeatedly to its investors.

100.    Thereafter, other M&I fraud investigators conducted their review and analysis each time an alert was triggered. For example, regarding the June 2005 alert, M&I's fraud

investigator specifically noted, "Customer's wire activity was reviewed . . . ." Regarding the March 2006 alert, M&I's fraud investigator determined, "There were 817 incoming wire deposits that totaled $2,562,339,740. Incoming wires were from Palm Beach Capital Corp., PAC Funding, Thousand Lakes LLC, Enchanted Family Buying Co., Metro Gem, etc." Regarding the August 2006 alert, M&I's fraud investigator learned, "There were 410 incoming wires…The wires were primarily from Enchanted Family Buying Company, Nationwide International Resources, Metro Gem Inc, Thousand Lakes LLC, PAC Funding LLC and WF Corporate Trust Operations." Regarding the October 2006 alert, M&I's fraud investigator discovered, "There were 418 incoming wires…The largest wire was from the Enchanted Family Buying Company…The remaining wires were primarily from Enchanted Family Buying Company, Nationwide International Resources, Metro Gem Inc., Thousand Lakes LLC, Palm Beach Capital Corp and WF Corporate Trust Operations. Which have all be noted in previous reviews." Regarding the September 2007 alert, M&I's fraud investigator again found, "Customer received 502 wires, ranging from $20-$35,902.05, for a total of $1,464,130,491.10. Wires were from various entities such as Acorn Capital, Enchanted Family, Metro Gem, Nationwide Int'l, Thousand Lakes, etc. . . ."

101.    Another such alert occurred in April/May 2008, along with the accompanying investigation, which is attached as Exhibit D. M&I's fraud investigator, who upon information and belief was the same investigator who had conducted many of the earlier investigations during at least the preceding 3 years, identified that during April/May 2008:

(1)    PCI "received 175 wires, ranging from $3,960 to $50mm, for a total of $1,007,972,208.08. Larger wires were from Thousand Lakes LLC."

(2)     PCI "sent out 264 wires, ranging from $4,498.33 to $15,217,500 for a total of $1,007,914,808.16. Larger wires were sent to Thousand Lakes LLC."

(3)     That during this two month period, Thousand Lakes was both the largest sender of wire transfers ($1.00792 billion) and the largest recipient of wire transfers ($1.00791 billion).

102.    M&I's fraud investigators consistently noted in their written reports that the wire activity they reviewed was also observed in prior reviews. M&I's fraud investigators never once noted an incoming wire from a big box retailer such as Walmart, even though M&I understood PCI's entire business model to be based on the sale of goods to big box retailers. PCI's investors had expressed ongoing concerns to M&I regarding whether such retailers were making direct payments into the M&I Account, and throughout this time, they were told that the retailers insisted that all payments be made directly to PCI through the M&I Account.

103.    Therefore, at all times from early 2005 through September 2008, M&I had actual knowledge that the flow of funds into the M&I Account directly contradicted the structure of PCI's business and representations that Petters was making to his investors.

104.    Armed with this actual knowledge that the flow of funds directly contradicted the structure of PCI's stated business model, as communicated to M&I multiple times, and which M&I knew had also been communicated to PCI's investors, M&I did not close the M&I Account or otherwise refuse to process any of the fraudulent transfers executed by Petters, Coleman, and White throughout this time. At no time did M&I disclose to PCI or its investors that Petters, Coleman, and White were looting PCI and defrauding PCI's investors, even after new investors continued to deposit substantial sums into the M&I Account.

**M&I Entered Into Deposit Control Agreements To Ensure
That Retailers' Payments Flow Directly To The Appropriate SPE**

105.    Through 2006, PCI had made billions of dollars in payments to its investors in a
timely manner. Near the end of 2007, however, PCI's payments to its investors began to slow,
and they began to ask why. Petters responded that the big-box retailers were experiencing
significant cash flow difficulties as the economy began to recede, which affected the shipment of
goods and timing of payments to the investors.

106.    To placate investors and to continue perpetrating the Ponzi scheme, Petters agreed
to enter into several Deposit Control Agreements in connection with the M&I Account. In the
Agreements, Petters declared that "Protected Party Funds" would be held in trust for the
Protected Party, thus acknowledging that the funds were not his own and had to be repaid to the
Protected Party.

107.    Generally, the framework of the Agreements was similar to the previous investor
proposals that M&I had rejected. M&I would transfer deposited retailer monies from the M&I
Account to the SPE based on a transaction list, which would detail the retailer and the amount
and date of payment being sent for the benefit of the investor.

108.    PBFP Holdings, LLC, Palm Beach Capital Corp., and Palm Beach Finance
Partners, L.P. (collectively, the "Palm Beach Fund") were PCI investors through a dedicated
SPE. The Palm Beach Fund was the first of PCI's investors to demand such an arrangement. The
Palm Beach Fund represented that it would withdraw from all PCI purchase order financing
transactions and close out its outstanding positions if PCI would not agree to enter into such an
arrangement.

109.    On February 8, 2008, Coleman emailed Flynn about setting up a Deposit Control
Agreement among M&I, PCI, and the Palm Beach Fund, attaching a draft agreement. Under the

- 33 -

terms of the draft agreement, M&I would agree that "Moneys deposited into the Deposit Account shall be held for the benefit of Petters and the Protected Parties" and that it would be liable for "any loss or damage . . . occasioned by the grow negligence or willful misconduct of M&I." Attached as Exhibit E, and incorporated herein by reference, is a copy of the e-mail and draft agreement that Coleman sent to Flynn dated February 8, 2008.

110.    On February 14, 2008, Flynn forwarded the draft agreement to Moline and another M&I employee, Carolyn Schwede, and requested that they review the document. Flynn noted, "There is urgency to get this handled for the customer Petters Company." Attached as Exhibit F, and incorporated herein by reference, is a copy of the email that Flynn sent Moline and Moline's reply, both dated February 14, 2008.

111.    In the reply, Moline questioned Flynn about, among other things, how M&I could fulfill its obligations and whether M&I was being properly compensated for its services.

112.    Also on February 14, 2008, Flynn forwarded the draft agreement to M&I's outside counsel, Kevin Busch at Moss & Barnett, P.A., asking whether Busch would "mind giving this a cursory review." Attached as Exhibit G, and incorporated herein by reference, is a copy of the email that Flynn sent Busch dated February 14, 2008.

113.    On February 18, 2008, Flynn sent an email to the Palm Beach Fund's counsel, Craig Howse, stating that M&I would attempt to accommodate the Palm Beach Fund so it could "feel comfortable with the working of the purchase order financing in which they are engaged." Attached as Exhibit H, and incorporated herein by reference, is a copy of the e-mail that Flynn sent Howse dated February 18, 2008.

114.    On February 19, 2008, Flynn sent an email to both Coleman and Howse outlining two factors that would make it "difficult" for M&I to execute the agreement, including:

1.    While we have good limited liability language protecting the bank from any liability from Petters, the Protected Parties are not a party to the agreement and could seek recourse from the bank if the directions supplied to the bank by Petters were somehow in dispute. Essentially, the bank is potentially put in the middle of some future dispute. We appear to take on some potential liability for which we are not compensated.

2.    It is unclear what value the bank provides in this arrangement to the Protected Parties – we are asked to perform work administering account transfers but we are only transferring in accordance with the direct instructions of Petters. Why can't Petters do this directly? It is not materially different from the perspective of the Protected Parties.

Attached as Exhibit I, and incorporated herein by reference, is a copy of the email that Flynn sent Coleman and Howse dated February 18, 2008.

115.    Despite these questions regarding how it would perform its functions, how it would be compensated, what potential liability it was taking on, and what value it was adding, on February 25, 2008, M&I executed a Deposit Control Agreement with PCI relating to the Palm Beach Fund (the "Palm Beach Deposit Agreement"). In signing the Agreement, M&I ignored internal policies and practices. Attached as Exhibit J, and incorporated herein by reference, is a copy of the Palm Beach Deposit Agreement.

116.    As set forth in the Palm Beach Deposit Agreement, M&I acknowledged and agreed that: (1) Petters would provide transaction lists to M&I at least once a week; (2) the transaction lists would identify the purchaser of the goods, the purchaser's payor bank, the purchase order date and number, the invoice date and number, the payment due date, the name of the investor which financed a given transaction and the amount of such financing; (3) M&I would control the disbursements from the M&I Account to ensure the transfer of monies to the Palm Beach Fund exclusively based on the transaction lists; and (4) the M&I Account would be under M&I's "<u>sole dominion and control</u>."

117.    As required by Section 3 of the Palm Beach Deposit Agreement, the Palm Beach Fund established an account at M&I (the "Palm Beach Account"). The purpose of the Palm Beach Account was to receive the monies routed by M&I from the M&I Account pursuant to its custodial and escrow duties under the terms of the Palm Beach Deposit Agreement.

118.    The Palm Beach Deposit Agreement was a significant undertaking for M&I and required "special handling" that would have entailed additional resources and costs. As Moline testified under oath:

> Q.     Had you ever been asked to do this or handle a request such as this in your banking career?
>
> A.     No.
>
> Q.     When you say take a person to monitor the account, who would that person be?
>
> A.     It would have had to have been one of the two folks out at that office. Whatever was in that control agreement and they were asking us to do, that staff person would have to do it.
>
> Q.     There's a cost associated with paying that staff person hourly rates and benefits and so forth, is that right?
>
> A.     Yes.
>
> Q.     Was there an arrangement for that cost to be passed on to the customer?
>
> A.     I don't know the answer to that question.
>
> Q.     Would you expect that cost to be passed on to the customer?
>
> A.     I would think so.
>
> Q.     Why is that?
>
> A.     It's special handling.
>
> Q.     What does special handling mean?

87023705.4

> A.    Anything over and above what a client would be asking you to do, whatever is in that control agreement.
>
> Q.    Did Mr. Flynn respond to your concern about getting fairly compensated?
>
> A.    I do not know that he ever came back and said -- I was never clear on that, no, whether he did or not.

Moline Dep. Tr. 82:8-83:16. Mar. 15, 2011.

119.    Ultimately, M&I, through Flynn, completely discounted and disregarded Moline's concerns regarding how M&I logistically would perform these special services, whether M&I was being fairly compensated, which employees could handle this role and whether the function should be performed by a different department within M&I. This is because M&I never intended to carry out its designated role under the control agreement.

120.    Moline acknowledged under oath that, because of the special and extraordinary nature of the contemplated services, she would not have expected M&I to execute the Palm Beach Deposit Agreement unless and until appropriate personnel first understood operationally and logistically what they needed to do to implement the agreement appropriately. They did not.

121.    Moline testified that M&I did not need to develop such an understanding because "we hadn't gotten that far":

> Q.    Did you ever discuss, communicate with anyone about what activity was taking place in the M&I Account in or about February of 2008?
>
> A.    No.
>
> Q.    For instance, did you know anything about how many wires were taking place on a daily or weekly basis?
>
> A.    Into their account, no. I had no knowledge of that account prior to any of this.
>
> Q.    I want to make sure we are clear on your testimony. Let me ask specific questions. I'm not talking about prior to this. I'm talking about in February of 2008 did you know

anything about the level of wire activity in or out of the [M&I Account]?

A. No.

Q. Or the amount of monies being deposited or being transferred out of the [M&I Account]?

A. No.

Q. Or the sources or uses of monies into or out of the [M&I Account]?

A. No.

Q. Did you undertake any thought process or analysis as to how much staff time would be required to perform this function?

A. No. We hadn't gotten that far.

\* \* \*

Q. Lower down it says, "So I would be concerned we get the staff or knowledge to take care of this." What did you mean by that?

A. I have two people out there. I was concerned about the amount of time it would take to do this for just one client.

Q. When you were expressing your concern about having the staff, did you do anything to understand the amount of activity that was even being discussed?

A. We hadn't gotten that far yet.

Q. How did you know whether or not you didn't have the staff, that perhaps there was only going to be one wire a week?

A. Because it's special handling, period, and it's not something we do for every customer, and whatever the activity would have been we would have had to be responsible for looking at it.

Moline Dep. Tr. 87:21-88:20; 103:16-104:8.

122.   Flynn cannot identify any instructions he ever provided to his staff as to logistically what they would need to do to perform, and he concedes that M&I had performed no due diligence before signing the Palm Beach Deposit Agreement.

123.   M&I's failure to undertake a perfunctory analysis of how it would perform its duties demonstrates its lack of intent to perform.

124.   By executing the Palm Beach Deposit Agreement without understanding how it would perform the contemplated functions, M&I acted in bad faith and violated bank industry standards and its own internal policies, procedures, or practices.

125.   M&I requires its officers to prepare written memoranda memorializing any "Substantial interaction where customer/prospect business and/or bank solutions/products were discussed in an in-depth and meaningful way." The memoranda must be prepared the month in which the "substantial interaction" occurred. No memoranda were prepared regarding the Palm Beach Deposit Agreement (that M&I executed) even though notes were made regarding the other proposed arrangements that M&I rejected.

126.   Further, M&I did not maintain a signed copy of the Palm Beach Fund Deposit Agreement in the ordinary course of its business.

127.   M&I agreed to enter into the Palm Beach Deposit Agreement with no compensation whatsoever, even though Flynn asserted that "if we're being asked to provide a service, it would be reasonable to expect that we should be compensated for doing that." Flynn Dep. Tr. 193:14-16. Moline was also concerned about who would pay the legal fees for outside counsel to review the agreement. Flynn never addressed with Moline any of these concerns.

128.    M&I's failure to even quantify its anticipated internal costs or otherwise price the services it would provide pursuant to the Palm Beach Deposit Agreement demonstrates its lack of intent to perform and its bad faith.

129.    M&I, through Moline, understood that to perform: (1) specific procedures needed to be drafted and (2) at least two M&I personnel must be adequately trained. M&I also understood that it had no existing policies, procedures, or guidelines in place for this new financial service that it was creating. And yet neither Moline nor any other M&I employee ever prepared any policies, procedures or guidelines outlining how M&I would perform the functions set forth in and created by the Palm Beach Deposit Agreement.

130.    Indeed, M&I expressly told its employees that M&I would not perform. Flynn specifically told Moline (i) the Palm Beach funds did not require the services set forth in the Palm Beach Control Agreement; and (ii) M&I would not sign the agreement and she need do nothing. Thus, M&I concealed the signing of the Palm Beach Fund Control Agreement from its own operations personnel.

**M&I Violated Bank Industry Standards**

131.    M&I's failures demonstrate that it knowingly violated bank industry standards and its own internal policies, procedures, and practices, and that it lacked an intent to perform and acted in bad faith. M&I's failures include without limitation:

- failing to prepare appropriate operating procedures;,

- failing to train appropriate personnel how to perform the agreed upon functions;

- failing to have an internal committee review or approve the creation, sale or implementation of this new product;

- failing to inform any personnel that it had executed the Palm Beach Deposit Agreement — other than the two officers who executed the Palm Beach Deposit Agreement;

- 40 -

- failing to maintain a copy of the executed agreement;

- failing to record or memorialize any of the discussions surrounding, or the actual execution of the Palm Beach Deposit Agreement;

- executing the Palm Beach Deposit Agreement not only without informing the appropriate operations personnel responsible for implementing the agreement, but after expressly informing such personnel that M&I in fact would not perform and need not perform; and

- executing the Palm Beach Deposit Agreement without informing the appropriate operations personnel responsible for implementing the agreement.

132. M&I's motivation in executing the Palm Beach Deposit Agreement and thereby misrepresenting its intent to perform was to appease Petters and PCI to enhance the potential to make additional profit from the Petters' relationship. M&I's overriding goal was to further and cultivate the relationship with Petters at the expense of and without regard to the Palm Beach Funds; other investors whose funds were held in trust in the M&I Account; bank industry standards; or M&I's own policies, procedures, and practices. M&I ultimately provided substantial assistance to Petters and his cohorts by giving investors the false sense of legitimacy and thus extending the fraud.

**M&I Entered Into Several Other Deposit Control Agreements**

133. One month after executing the Palm Beach Deposit Agreement, M&I entered into similar agreements for other PCI investors, including Ritchie Capital Management, Ltd. ("Ritchie") and Interlachen Harriet Investments, Ltd. ("Interlachen").

134. In May 2008, Ritchie lent $31 million to PCI to finance the purchase of Sony PlayStations. The deal purportedly was structured such that Costco was to purchase the Sony PlayStations, generating a $27 million profit. In connection with the transaction, on or about March 19 and 20, 2008, Petters, representatives of Ritchie, representatives of M&I, and other potential investors participated in two separate conference calls to discuss the structure of the

- 41 -

87023705.4

proposed transaction and the establishment of a deposit control agreement in favor of the investors that ultimately advanced the investments. Flynn made representations during those conference calls that M&I would establish a separate account at its bank for PCI to collect and deposit the revenues and proceeds paid by Costco for the purchase of the Sony PlayStations at issue. Flynn made further representations that M&I had established similar deposit control accounts for other investors who were seeking comfort that the proceeds of the purchase order financings were protected in a separate account for their benefit and would be used to pay back their investments.

135.    M&I ultimately executed a deposit account control agreement with PCI relating to Ritchie (the "Ritchie Deposit Agreement"). A copy of the Ritchie Deposit Agreement is attached, and incorporated herein by reference, as Exhibit K.

136.    On May 29, 2008, M&I executed a deposit control agreement with PCI relating to Interlachen (the "Interlachen Deposit Agreement"). A copy of the Interlachen Deposit Agreement is attached, and incorporated herein by reference, as Exhibit L.

137.    Each agreement provided that money "deposited in the [M&I Account] . . . shall be held for the benefit of Petters and the Protected Part[ies]." The Palm Beach Deposit Agreement, the Ritchie Deposit Agreement, and the Interlachen Deposit Agreement are collectively referred to throughout as the "Deposit Control Agreements."

### M&I Took No Steps To Perform Any Of Its Obligations Under The Deposit Control Agreements

138.    M&I took no steps to perform any of its obligations under the Deposit Control Agreements, even though M&I considered the contemplated services to be special and extraordinary.

87023705.4

139.    In sum, M&I violated bank industry standards and its own internal policies, procedures, or practices by, among other things:

- Failing to make even an perfunctory analysis of how it would perform its duties and obligations under the Deposit Control Agreements;

- Imposing no charge for the special and extraordinary services it represented it would provide pursuant to the Account Control Agreements and failing to even consider what an appropriate charge would be;

- Preparing no operating procedures to enable it to perform the functions set forth in and created by the Deposit Control Agreements, even though M&I knew specific procedures needed to be drafted because it had no existing policies, procedures or guidelines in place;

- Failing to train any personnel how to perform the agreed upon functions set forth in and created by the Deposit Control Agreements;

- Failing to inform M&I employees – other than the signatories – about the Deposit Control Agreements or M&I's obligations thereunder;

- Failing to obtain internal committee approval before entering into the Deposit Control Agreements, which in essence represented a new product;

- Failing to maintain an executed copy of the Palm Beach Deposit Control Agreement in its files;

- Failing to memorialize any discussions regarding the Palm Beach Deposit Control Agreement in its meeting notes;

- Failing to obtain or attempt to obtain any transaction lists from PCI.

140.    The Federal Financial Institutions Examination Council has published a list of suspicious activities or "red flags" that indicate money laundering. The activity in the M&I Account violated, without limitation, the following of those "red flags":

**Activity Inconsistent with the Customer's Business**

- The currency transaction patterns of a business show a sudden change inconsistent with normal activities.

- 43 -

- A large volume of cashier's checks, money orders, or funds transfers is deposited into, or purchased through, an account when the nature of the accountholder's business would not appear to justify such activity.

- Unusual transfers of funds occur among related accounts or among accounts that involve the same or related principals.

- Goods or services purchased by the business do not match the customer's stated line of business.

- Payments for goods or services are made by checks, money orders, or bank drafts not drawn from the account of the entity that made the purchase.

- The stated occupation of the customer is not commensurate with the type or level of activity.

**<u>Funds Transfers</u>**

- Many funds transfers are sent in large, round dollar, hundred dollar, or thousand dollar amounts.

- Many small, incoming transfers of funds are received, or deposits are made using checks and money orders. Almost immediately, all or most of the transfers or deposits are wired to another city or country in a manner inconsistent with the customer's business or history.

- Funds transfer activity is unexplained, repetitive, or shows unusual patterns.

- Payments or receipts with no apparent links to legitimate contracts, goods, or services are received.

- Funds transfers are sent or received from the same person to or from different accounts.

- Funds transfers contain limited content and lack related party information.

- Many incoming or outgoing funds transfers take place through a business account, and there appears to be no logical business or other economic purpose for the transfers, particularly when this activity involves higher-risk locations.

**Other Unusual or Suspicious Customer Activity**

- Suspicious movements of funds occur from one bank to another, and then funds are moved back to the first bank.

- Customer uses a personal account for business purposes.

141.   The foregoing actions and inactions by M&I violated bank industry standards and, upon information and belief, its own internal policies, procedures, or practices. The violations demonstrate M&I's bad faith and facilitated the breach of duties owed to PCI and to investors by PCI fiduciaries.

<b>Spoliation Of Essential Evidence</b>

142.   In *Palm Beach Finance Partners, et al. v. BMO Harris*, venued in United States Bankruptcy Court, Southern District of Florida, Palm Beach Division (Adv. Case No. 11-3015), the Liquidating Trustee's Rule 2004 investigation and fact discovery revealed that M&I failed to produce important documents and information in response to the Liquidating Trustee's discovery requests.  In particular, M&I has either admitted destroying or otherwise failing to provide the following categories of documents:

a.   Email:  M&I confirmed that it destroyed all electronic and paper versions of all email relating in any way to the Florida matter pre-dating 2005, to include all back-up tapes for all servers, hard drives, and any other sources of email for all relevant bank officers and employees. After repeated communications between the Liquidating Trustee in the Florida litigation and M&I regarding these emails, electronic storage and any other alternative source, M&I confirmed it did not have any additional electronic or paper emails to produce.

b.    <u>Reports and documents attached to emails</u>: M&I failed to produce any reports regarding significant account activity in the M&I Account before March 2005. As of March 2005, various reports were attached to emails between bank officers, such as reports of significant fluctuations in deposit activity listing dozens of multi-million dollar transactions in the M&I Account. M&I produced some reports as attachments to emails beginning March 2005 and later, but failed to produce any similar reports before that date, although the account activity was substantially similar and the M&I Account activity would have been similarly reported to M&I officers. M&I admitted it did not have any additional documents to produce.

c.    <u>Anti-Money Laundering Reports</u>: Before 2005, as part of M&I's anti-money laundering program, M&I generated a 500-plus page monthly report identifying potentially problematic, unusual, or suspicious account activity, and the report was reviewed manually. Because the M&I Account activity was essentially consistent throughout the time it was open from 2001 until 2008, including millions of dollars in numerous large wire transfers into and out from the account on a daily basis and low-ending balances (among the many well-established red flags in anti-money laundering and fraud investigations), and Searchspace alerted the extraordinary activity virtually monthly for over three years, upon information and belief the M&I Account should have appeared on M&I's monthly AML report on at least some occasions from 2001 until March 2005. However,

M&I failed to produce a single such report in the Florida litigation, and stated it did not have any additional documents to produce.

143.    M&I had a duty to retain these documents triggered by anticipated litigation following the September 24, 2008 public disclosure of the massive fraud in the M&I Account. Indeed, after the fraud was exposed, M&I was issued a grand jury subpoena in connection with the various criminal prosecutions. M&I intentionally destroyed and failed to produce these documents *after* September 24, 2008.

144.    M&I's actions give rise to an inference that the documents would be adverse to it and would be probative of M&I's liability and misconduct, particularly regarding its bad faith, actual knowledge and substantial assistance to the Petters Ponzi scheme.

145.    The Trustee of the BMO Litigation Trust is prejudiced by his inability to access these critical documents and communications.

## COUNT I – VIOLATION OF THE MINNESOTA UNIFORM FIDUCIARIES ACT (THE "MUFA"), MINN. STAT. § 520.08

146.    Plaintiff realleges and incorporates by reference the preceding paragraphs of the First Amended Complaint ("FAC") as if fully set forth herein.

147.    Petters, Coleman, and White served as officers and directors of multiple Petters entities, including PCI. As officers and directors, Petters, Coleman, and White owed the investors – whose funds were deposited in trust in the M&I Account – fiduciary duties of care, loyalty, and good faith, because the investors were "Principals" under Minn. Stat. § 520.01, Subd.5. Those fiduciary duties also extended to PCI.

148.    M&I had actual knowledge that Petters, Coleman, and White served as officers and directors of multiple Petters entities, including PCI, and thus that, as officers and directors,

Petters, Coleman, and White owed fiduciary duties of care, loyalty, and good faith to PCI and to the investors whose funds were deposited in trust in the M&I Account.

149.    Petters, Coleman and White owed a fiduciary duty to the investors in connection with the handling of the investors' funds in the M&I Account. M&I had actual knowledge that all funds in the M&I Account were held in trust, pursuant to Petters', Coleman's, and White's fiduciary duties.

150.    Petters, Coleman, and White breached their fiduciary duties by, among other things, transferring billions of dollars from the M&I Account for the purpose of continuing and prolonging the Ponzi scheme and transferring tens of millions of dollars for their personal benefit and use, thus misappropriating funds from those investors who had transferred funds into the M&I Account with the expectation that their investments would be repaid. M&I processed these billions of dollars of transactions that resulted in billions of dollars being transferred out of the M&I Account.

151.    M&I had actual knowledge that when Petters, Coleman, and White transferred billions of dollars out of the M&I Account for the purposes of continuing and prolonging the Ponzi scheme, they did so in violation of their fiduciary duties. M&I's knowledge and action in allowing Petters, Coleman, and White to transfer funds from the M&I Account under these circumstances amounted to bad faith. M&I also demonstrated its bad faith by violating industry and internal standards, policies, and procedures in furtherance of Petters', Coleman's, and White's scheme. M&I further demonstrated its bad faith by destruction of probative documents. As a result, M&I is liable under Minn. Stat. §520.08 for all such transfers out of the M&I Account that were made in violation of Petters', Coleman's and White's fiduciary duties.

152.    M&I's actions and inactions as described herein violated the MUFA.

- 48 -

153.    As a direct and proximate result of M&I's conduct, Plaintiff is entitled to damages in an amount exceeding $50,000, the exact amount to be proven at trial.

## COUNT II – BREACH OF FIDUCIARY DUTY

154.    Plaintiff realleges and incorporates by reference the preceding paragraphs of the First Amended Complaint as if fully set forth herein.

155.    M&I entered into various Deposit Control Agreements with investors, each of which stated that: "Monies deposited into the [M&I Account] shall be received by M&I as wire transfers or collected funds [and] shall be held for the benefit of PCI and the Protected Party . . . ." Those Agreements also state that M&I shall be liable "for any loss or damage . . . occasioned by gross negligence or willful misconduct of M&I."

156.    M&I had knowledge that all investor funds deposited in trust in the M&I Account were to be held for the benefit of PCI and investors, regardless of whether each investor executed a formal Deposit Control Agreement, and that, as a result of that knowledge, M&I owed a fiduciary duty to PCI and the investors whose funds were deposited in trust in the M&I Account.

157.    M&I's knowledge and action in allowing Petters, Coleman and White to transfer funds from the M&I Account under the circumstances outlined above constituted gross negligence or willful misconduct and was a breach of its fiduciary duty to PCI and the investors whose funds were deposited in trust in the M&I Account.

158.    As a direct and proximate result of M&I's conduct, Plaintiff is entitled to damages in an amount exceeding $50,000, the exact amount to be proven at trial.

## COUNT III – AIDING AND ABETTING FRAUD

159.    Plaintiff realleges and incorporates by reference the preceding paragraphs of the First Amended Complaint as if fully set forth herein.

87023705.4

160.    Petters, Coleman, and White were perpetrating a massive fraud and were laundering the proceeds of the fraud to conceal the ownership, source and location of the funds.

161.    M&I had actual knowledge of the fraud. M&I knew that Petters, Coleman, and/or White were perpetrating a fraud or engaging in other wrongful acts through the M&I Account based upon, among other things, M&I's knowledge of the manner in which the purchase order financing transactions were supposed to be conducted, and M&I's knowledge that no funds flowed from any retailers to the M&I Account and that instead the M&I Account was funded from Nationwide, Enchanted, and investors whose funds were deposited in trust in the M&I Account, and that the representations and recitals set forth in the Deposit Control Agreements were materially false.

162.    By, among other things, effectuating tens of billions of dollars in wire transfer payments through the M&I Account, M&I provided substantial assistance to the Petters Ponzi scheme. In addition, by entering into multiple Deposit Control Agreements with PCI investors, which M&I knew violated bank industry standards and its own internal policies, procedures, and practices, and which M&I lacked an intent to perform and acted in bad faith, M&I also provided substantial assistance to the Petters Ponzi scheme.

163.    As a result of the continuing fraud, investors continued to pour money into the Ponzi scheme through September 2008.

164.    Without the substantial assistance that M&I provided, the Ponzi scheme would have been discovered earlier by law enforcement authorities and victims of the Ponzi scheme.

165.    As a direct and proximate result of M&I's conduct, Plaintiff is entitled to damages exceeding $50,000, the exact amount to be proven at trial.

87023705.4

## COUNT IV – AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

166.    Plaintiff realleges and incorporates by reference the preceding paragraphs of the First Amended Complaint as if fully set forth herein.

167.    Petters, Coleman, and White served as officers and directors of multiple Petters entities, including PCI and various SPEs. As officers and directors, Petters, Coleman, and White owed fiduciary duties of care, loyalty, and good faith to their companies, and the investors whose funds were deposited in trust in the M&I Account, which was a fiduciary account.

168.    PCI and SPE were insolvent from their creation and throughout the entire course of the Ponzi scheme.

169.    As officers and directors of insolvent entities, Petters, Coleman, and White owed a duty not only to those entities, but also to the investors in those entities.

170.    Rather than acting in a manner consistent with their fiduciary duties, Petters, Coleman, and White engaged in a series of actions injuring those investors and entities, including, but not limited to, looting tens of millions of dollars for their personal use and using every means available to prolong (and thereby deepen) the Ponzi scheme. Petters, Coleman, and White's actions not only injured the entities but also damaged the investors whose funds were deposited in trust in the M&I Account.

171.    M&I had actual knowledge of Petters', Coleman's, and White's breaches of fiduciary duties. M&I knew that Petters, Coleman, and White were breaching their fiduciary duties or engaging in other wrongful acts through the M&I Account based upon, among other things, M&I's knowledge of the manner in which the purchase order financing transactions were supposed to be conducted; M&I's knowledge that, in fact, no funds flowed from any retailers to the M&I Account but rather the M&I Account was funded primarily by investors; and M&I's knowledge that the representations and recitals set forth in the Deposit Control Agreements were

- 51 -

materially false. M&I also had actual knowledge that millions of dollars in payments from the M&I Account were sent directly to Petters' individual bank accounts.

172.    M&I substantially assisted Petters, Coleman and White's breaches of fiduciary duties.

173.    As a direct and proximate result of M&I's conduct, Plaintiff is entitled to damages exceeding $50,000, the exact amount to be proven at trial.

### COUNT V – CIVIL CONSPIRACY

174.    Plaintiff realleges and incorporates by reference the preceding paragraphs of the First Amended Complaint as if fully set forth herein.

175.    The Ponzi scheme was a massive fraud, perpetrated over a number of years, with many victims.

176.    Petters, Coleman, and White conspired for more than a decade to defraud investors to the Ponzi scheme.

177.    Upon information and belief, M&I conspired with Petters, Coleman, and White to fraudulently represent to investors that M&I would comply with the Deposit Control Agreements.

178.    Upon information and belief, M&I conspired with Petters, Coleman, and White to fraudulently represent to investors that PCI would comply with the Deposit Control Agreements.

179.    Upon information and belief, M&I and Petters, Coleman, and White had a meeting of the minds that they would represent to investors, including the Palm Beach Fund, Ritchie and Interlachen, that they would comply with the Deposit Control Agreements.

180.    Upon information and belief, M&I and Petters, Coleman, and White had a common understanding to commit this wrong.

- 52 -

87023705.4

181.    Upon information and belief, M&I and Petters, Coleman, and White committed conspiratorial acts in furtherance and in pursuit of this wrong.

182.    Upon information and belief, M&I conspired with Petters, Coleman, and White to commit fraud through the Deposit Control Agreements that were part of the Petters Ponzi Scheme, which caused massive damages.

183.    As a direct and proximate result of this conduct, Plaintiff is entitled to damages in an amount exceeding $50,000, the exact amount to be proven at trial.

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in favor of the Trustee and against Defendant M&I as follows:

A.    On Count I – Enter judgment in favor of Plaintiff and against Defendant and award Plaintiff compensatory damages in an amount to be determined at trial plus punitive damages in an amount to be determined at trial appropriate to the severity of the Defendant's conduct and its financial ability to pay;

B.    On Count II – Enter judgment in favor of Plaintiff and against Defendant and award Plaintiff compensatory damages in an amount to be determined at trial plus punitive damages in an amount to be determined at trial appropriate to the severity of the Defendant's conduct and its financial ability to pay;

C.    On Count III – Enter judgment in favor of Plaintiff and against Defendant and award Plaintiff compensatory damages in an amount to be determined at trial plus punitive damages in an amount to be determined at trial appropriate to the severity of the Defendant's conduct and its financial ability to pay;

D.    On Count IV – Enter judgment in favor of Plaintiff and against Defendant and award Plaintiff compensatory damages in an amount to be determined at trial plus punitive

87023705.4

damages in an amount to be determined at trial appropriate to the severity of the Defendant's conduct and its financial ability to pay;

E.     On Count V – Enter judgment in favor of Plaintiff and against Defendant and award Plaintiff compensatory damages in an amount to be determined at trial plus punitive damages in an amount to be determined at trial appropriate to the severity of the Defendant's conduct and its financial ability to pay;

F.     Award prejudgment interest on each Count to the extent allowed under applicable law or statute;

G.     Award Plaintiff's reasonable attorney fees and costs to any Count to the extent allowed under applicable law or statute; and

H.     Grant such further relief this Court deems just and proper.


DATED: October 20, 2016                    ROBINS KAPLAN LLP


                                           By: */s/ Thomas L. Hamlin*
                                               Thomas L. Hamlin
                                               Michael D. Reif
                                               William Bornstein
                                               Sarah E. Friedricks
                                               2800 LaSalle Plaza
                                               800 LaSalle Avenue
                                               Minneapolis, MN 55402-2015
                                               THamlin@RobinsKaplan.com
                                               MReif@RobinsKaplan.com
                                               WBornstein@RobinsKaplan.com
                                               SFriedricks@RobinsKaplan.com
                                               Telephone:  612-349-8500
                                               Facsimile:  612-339-4181

                                           **ATTORNEYS FOR DOUGLAS A. KELLEY,
                                           TRUSTEE OF BMO LITIGATION TRUST**

87023705.4

## CERTIFICATE OF SERVICE

I, Theresa DesMarais Olson, legal assistant to Thomas L. Hamlin, hereby certify that on October 20, 2016, a true and correct copy of the foregoing First Amended Complaint was electronically filed with the Clerk of Court using the CM/ECF system, and thereby sending a notice of electronic filing to all counsel of record in this matter.

*/s/ Theresa DesMarais Olson.*
Theresa DesMarais Olson

87023705.4