UNITED STATES BANKRUPTCY COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| In re: | **Jointly Administered under BKY 08-45257** |
| Petters Company, Inc., et al, | BKY 08-45257 |
| Debtors. | |
| (includes | Court File Nos.: |
| Petters Group Worldwide, LLC; | 08-45258 |
| PC Funding, LLC; | 08-45326 |
| Thousand Lakes, LLC; | 08-45327 |
| SPF Funding, LLC; | 08-45328 |
| PL Ltd., Inc.; | 08-45329 |
| Edge One LLC; | 08-45330 |
| MGC Finance, Inc.; | 08-45331 |
| PAC Funding, LLC; | 08-45371 |
| Palm Beach Finance Holdings, Inc.) | 08-45392 |
| | Chapter 11 Cases |
| | Judge Kathleen H. Sanberg |
| _____ | |
| Douglas A. Kelley, in his capacity as the Trustee of the BMO Litigation Trust, | ADV 12-4288 |
| Plaintiff, | |
| v. | |
| BMO Harris Bank N.A., as successor To M&I Marshall and Ilsley Bank, | |
| Defendant. | |

---

ORDER GRANTING PLAINTIFF'S MOTION FOR RULE 37 SANCTIONS FOR
DEFENDANT'S SPOLIATION OF EVIDENCE

---

At Minneapolis, Minnesota, July 1, 2019.

NOTICE OF ELECTRONIC ENTRY AND
FILING ORDER OR JUDGMENT
Filed and Docket Entry made on *07/01/2019*
Lori Vosejpka, Clerk, by LH

This matter is before the Court on Liquidating Trustee Douglas A. Kelley's ("Plaintiff")

Motion for Rule 37 Sanctions for the Spoliation of Evidence by BMO Harris Bank N.A.

("Defendant").[1]

On March 5, 2019, the Court heard oral argument on Plaintiff's motion.  Michael

Collyard appeared for Plaintiff and Richard Spehr appeared for Defendant.

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§

157(b)(1) and 1334, Fed. R. Bankr. P. 7001, and Local Rule 1070–1.  This is a core proceeding

within the meaning of 28 U.S.C. § 157(b)(2)(H).  Venue in this Court is proper pursuant to 28

U.S.C. §§ 1408 and 1409.

The Court grants the motion and finds that the actions taken by Defendant warrant

sanctions under Federal Rule of Civil Procedure 37(e) for the spoliation of evidence.  An adverse

inference instruction that Defendant intentionally destroyed and failed to preserve Minnesota

email backup tapes that it knew were harmful is appropriate.  In the event the District Court finds

that this Court lacks the authority to make such a determination, the Court recommends the

same.

Given the serious nature of spoliation sanctions, the Court will go through a detailed and

thorough review of Defendant's conduct but will first summarize the facts leading to its

conclusions.

### Summary

The issue in this motion is whether Defendant intentionally or in bad faith destroyed or

failed to preserve electronically stored information ("ESI") on computer backup tapes that

---

[1] As successor in interest to M&I Marshall and Ilsley Bank.

contained relevant information in this case that it had a duty to preserve.  The Court finds that Defendant did.

During discovery in this case, Defendant has dragged its feet or fought production of relevant information every step of the way.  When the issue of the lost or destroyed computer backup tapes arose, however, the fight turned to deceit and obfuscation.  Defendant lied to its counsel, lied to the Court, and lied to Plaintiff.

Defendant's actions in destroying or failing to preserve the backup tapes, its actions during this case, and the $2 billon dollar value of the case (and motive for Defendant to destroy information) leads the Court to conclude that Defendant intentionally destroyed or failed to preserve the email backup tapes.

The Court will go through the facts in complete and, sometimes, repetitious detail below, but the following is a summary recitation of what has happened that leads to the Court's conclusions and imposition of sanctions under Federal Rule of Civil Procedure 37(e) for Defendant's spoliation of evidence:

- Defendant destroyed approximately 60 computer backup tapes in 2010 and 2011 that it had a duty to retain.  It destroyed the tapes 1) after receiving an order enjoining the destruction of information regarding Thomas J. Petters ("Petters"), Petters Company, Inc. ("PCI"), and its affiliates, 2) after discussing documentation retention with its counsel on a number of occasions, and 3) after having legal holds in place.  These tapes were Defendant's only source of emails from a significant period in the relationship between Petters and Defendant;

- The destruction was not part of a routine process but rather a one-time project;

- Defendant lost or destroyed six computer backup tapes found in 2014 that it had a duty to retain;

3

- Defendant failed to disclose the tapes found in 2014 in connection with earlier litigation or in this case until this Court was considering sanctions regarding backup tapes found in 2017;

- Defendant found tapes in 2017 but failed to disclose the discovery to its own counsel until a month later and well after the deposition of a key witness;

- Defendant's counsel failed to disclose the discovery of the tapes to Plaintiff until after the close of discovery;

- Defendant cannot verify that the tapes found in 2017 were the same as those found in 2014 but continues to advance this argument;

- Defendant lied, by omission or commission, to the Court and Plaintiff, even after being sanctioned;

- Defendant produced documents for an *in camera* review by the Court that were redacted or incomplete;

- Defendant's witnesses and counsel failed to disclose information to the Court during several hearings;

- Defendant failed to timely produce evidence after being ordered to do so; and

- Defendant has been subject to discovery sanctions for willful discovery abuses and for failure to comply with the Court's discovery orders.

### Arguments

Plaintiff, in his capacity as the Trustee of the BMO Litigation Trust, brings this motion under Rule 37(e) for sanctions based on two alleged spoliations of evidence: first, for the destruction of virtually all of the computer backup tapes—approximately 66—holding all emails and other information regarding Defendant's handling of Petters' and his affiliates' M&I bank accounts between 2010 and 2011; and second, for the failure to preserve six backup tapes that had not been destroyed but were found in August 2014. Plaintiff asserts that the lost or destroyed backup tapes were the only source of Defendant's emails that predate March 2005 and that covered a significant period during Defendant's dealings with Petters, PCI, and its affiliates.

Plaintiff alleges that Defendant destroyed the tapes with an intent to deprive Plaintiff of the ability to use the information in this adversary proceeding. Among other remedies, Plaintiff requests an adverse inference jury instruction that Defendant intentionally destroyed evidence that it knew was harmful.

Defendant argues that Plaintiff's motion should be denied for four independent reasons. First, an adverse inference instruction and Plaintiff's other requested remedies are trial administration matters best left for the District Court. Second, Plaintiff cannot meet his burden of showing prejudice under Rule 37(e)(1). Third, Plaintiff cannot meet his burden of showing a bad faith intent under Rule 37(e)(2). And fourth, Plaintiff's requested sanctions are neither feasible nor appropriate.

### Background and Procedural History

This adversary proceeding originates from the failure of the Petters' Ponzi scheme orchestrated by Petters" and his associates.[2] Plaintiff filed suit against Defendant on November 14, 2012, alleging violations of the Minnesota Uniform Fiduciaries Act, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, aiding and abetting fraud, and civil conspiracy for its actions in connection with Petters and Petters Company, Inc. ("PCI").[3] Tens of billions of dollars in Ponzi scheme funds were routed through PCI's depository checking at National City

---

[2] The Honorable Judge Susan R. Nelson of the United States District Court for the District of Minnesota recently provided a detailed background of the Ponzi scheme in *Kelley v. Kanios*, Case No. 18-cv-823 (SRN/SER), 2019 WL 2193163 (D. Minn. May 20, 2019). *See e.g.*, *In re Petters Co., Inc.*, 548 B.R. 551 (Bankr. D. Minn. 2016); *In re Petters Co., Inc.*, 506 B.R. 784 (Bankr. D. Minn. 2013); *In re Polaroid Corp.*, 472 B.R. 22 (Bankr. D. Minn. 2012), *aff'd*, 779 F.3d 857 (8th Cir. 2015); *In re Petters Co., Inc.*, 440 B.R. 805 (Bankr. D. Minn. 2010); *In re Petters Co., Inc.*, 401 B.R. 391 (Bankr. D. Minn. 2009), *aff'd*, 620 F.3d 847 (8th Cir. 2010); *see also SEC v. Quan*, 817 F.3d 583, 587–89 (8th Cir. 2016); *In re Cypress Fin. Trading Co., L.P.*, 620 F. App'x. 287, 288 (5th Cir. 2015); *Varga v. U.S. Bank Nat'l Ass'n*, 764 F.3d 833, 836–37 (8th Cir. 2014); *Peterson v. Winston & Strawn LLP*, 729 F.3d 750, 751 (7th Cir. 2013); *Peterson v. Somers Dublin Ltd.*, 729 F.3d 741, 744 (7th Cir. 2013); *In re Palm Beach Fin. Partners, L.P.*, 527 B.R. 518, 521 (S.D. Fla. 2015); *In re Palm Beach Fin. Partners, L.P.*, 517 B.R. 310, 319–21 (Bankr. S.D. Fla. 2013).

[3] Dkt. 55.

Bank, opened in December 1999 (the "PCI Account").  M&I acquired National City Bank in

July 2001.  Plaintiff alleges that Defendant knew about Petters' fraud and through its banking

and related financial services to Petters and PCI, was complicit in the Ponzi scheme by presiding

over the PCI Account where the Ponzi scheme funds were laundered and failing to intervene

despite significant "red-flag behavior."[4]  Requested damages in this case are almost $2 billion

dollars.

After the Petters' Ponzi scheme was uncovered in late 2008, Judge Ann Montgomery of

the United States District Court for the District of Minnesota appointed Plaintiff, Douglas

Kelley, as the equity receiver for PCI and its affiliates.  On October 11, 2008, Kelley, in his

capacity and pursuant to his authority as receiver, filed a Chapter 11 petition for relief on behalf

of PCI.  Plaintiff was appointed the Chapter 11 Trustee on February 26, 2009.

Judge Gregory F. Kishel confirmed the Second Amended Plan of Chapter 11 Liquidation

on April 15, 2016 (the "Plan").[5]  The Plan established the BMO Litigation Trust, which is

administered by the Plaintiff as Liquidating Trustee.[6]  The Plan transferred the BMO Litigation

Trust Assets, including the causes of action asserted in this adversary proceeding, to the BMO

Litigation Trust.[7]

## I.      Ponzi Scheme's Collapse and Defendant's Anticipation of Litigation

On October 6, 2008, shortly after the Ponzi scheme collapsed and before the bankruptcy

petition was filed, Judge Montgomery issued an Order for Entry of Preliminary Injunction on

October 6, 2008 (the "Injunction Order").[8]  The Injunction Order enjoined third party financial

---

[4] Dkt. 55 at 2–4.
[5] *In re Petters Co., Inc.*, No. 08-45257 (Bankr. D. Minn.), Dkt. 3305.
[6] *Id.*
[7] *Id.*
[8] Pl.'s Mem., Dkt. 343, Ex. 1.

and banking institutions, including Defendant, from disposing of any material "business,
corporate, foundation, banking, financial, and/or accounting records in their possession" related
to Petters, PCI, and other affiliated entities.[9]

There is no dispute that Defendant received the Injunction Order on the day it was issued.
On that day, and on numerous later occasions, Defendant sought advice from counsel concerning
the Injunction Order and retention of Petters and PCI-related documents.[10]  M&I Bank therefore
should have known it had a duty to preserve evidence no later than October 2008.[11]  Defendant
issued its first formal litigation hold on January 31, 2010.[12]  A second hold was issued on
October 20, 2010.[13]

## II.     M&I's Email System and Regional Server Decommissioning Project

The evidence that was admittedly destroyed are computer backup tapes containing ESI
that held emails and other information related to Petters, the PCI Account, and other affiliated
accounts during relevant periods.  First, the Court will describe Defendant's email and computer
backup systems.

### A.     *Pre-Legato and Legato*

Prior to 2005, M&I employees used a Lotus Notes email platform.[14]  The email and other
data for Minnesota employees were stored on a server located in Minneapolis, Minnesota.[15]
Regional email servers, including the Minnesota server, were backed up daily and captured all

---

[9] *Id*. at 8–9.
[10] *Id*. at Ex. 6, Nos. 42–43, 48–49.  During discovery in this case, Defendant asserted work-product as the privilege
basis for a number of entries in its privilege log referencing the Injunction Order and Petters between October and
December 2008.  *Id*. at Nos. 43, 47, 48–52, 103–06.
[11] Dkt. 268 at 74:12–16 (Apr. 5, 2018).
[12] Pl.'s Mem., Dkt. 343, Ex. 51 at 9.
[13] *Id*.
[14] Def.'s Resp., Dkt. 344, Ex. B at ¶¶ 2–3.  M&I utilized a "hub and spoke" system where regional servers housed
separate email servers.  *Id*. at Ex. C.
[15] Def.'s Resp., Dkt. 344, Ex. C.

emails contained in the servers' mailboxes at the time the backup occurred.[16]  Daily backup tapes

were preserved for thirty days before being over-written.[17]  The backup tape for the last day of

each month was preserved for three years before being recycled.[18]  Generally, the final backup

tape for each year was preserved for up to seven years before being recycled.[19]  The regional

email servers were backed up for disaster recovery purposes.[20]  Before March 2005, if an email

was deleted from an employee's inbox before the daily backup occurred it would not be captured

on the backup tape.[21]

In March 2005, M&I implemented a new email archive system called "Legato."[22]  Legato

automatically captured an exact copy of every email sent or received by M&I employees.[23]

Although employees could delete an email from their inbox, they could not prevent emails from

being archived in Legato.[24]  After March 2005, Legato became the "go-to location" for pulling

emails in response to litigation holds.[25]  Legato did not capture all information that was captured

on the Lotus Notes system, including calendar events, attachments, and all other files contained

in a given mailbox.[26]

B.    *Regional Server Decommissioning Project*

In the summer of 2009, M&I began planning a decommissioning project for almost all of

its regional servers, including the Minnesota server.[27]  John Vanderheyden was the M&I

---

[16] Def.'s Resp., Dkt. 344, Ex. D at ¶¶ 11–12, Ex. E at 73:2–4, 79:5–12, 83:15–84:10.
[17] Def.'s Resp., Dkt. 344, Ex. E at 79:5–12, 83:15–84:10.
[18] *Id.*
[19] *Id*. at 83:21–84: 10.
[20] Def.'s Resp., Dkt. 344, Ex. E at 67:6–8.
[21] Def.'s Resp., Dkt. 344, Ex. D at ¶¶ 11–12.
[22] Def.'s Resp., Dkt. 344, Ex. B at ¶ 8.
[23] *Id*. at ¶¶ 4–9.
[24] *Id*. at ¶ 23.
[25] Def.'s Resp., Dkt. 344, Ex. E at 180:12–181:4.
[26] Dkt. 268 at 118:13–21 (Apr. 5, 2018).
[27] *Id*. at 191:17–194:7, 198:18–22.

employee responsible for supervising the project and the "Lotus Notes" team.  The Lotus Notes team replicated the email data from all of the regional servers onto the two remaining centralized servicers in Milwaukee and Brookfield, Wisconsin.[28]  Final backup tapes were then created from each regional server.[29]  The final regional backup tape for the Minnesota server was created on September 24, 2010.[30]  Paul Kavalauskas, a member of the Lotus Notes team, had the final backup tapes sent to his office at M&I's Centre Point location in West Allis, Wisconsin, to be recycled (i.e. destroyed).[31]  The final 60 backup tapes arrived at the Centre Point location for recycling around October 2010.[32]

The Minnesota tapes were destroyed sometime between October 2010 and January 2011, despite the litigation holds and Injunction Order.[33]  No effort was made to assess what was on the tapes before their destruction.[34]  The few tapes that survived, as well as documents produced by third parties, confirm that the backup tapes destroyed between October 2010 and January 2011 held relevant emails concerning Petters, his companies, and the PCI Account.[35]  Vanderheyden, the person responsible for overseeing the decommissioning project, admitted to receiving and knowing about the litigation holds.[36]  Despite the litigation holds, counsel was not consulted prior to the destruction.[37]

---

[28] *Id*. at 202:17–205:4.
[29] *Id*. at 208:7–13, 212:14–23.
[30] Def.'s Resp., Dkt. 344, Ex. G.
[31] *Id*.
[32] Pl.'s Mem., Dkt. 343, Exs. 2–3; Def.'s Resp., Dkt. 344, Exs. H, J– K.
[33] Pl.'s Mem., Dkt. 343, Ex. 2 at 4; Def.'s Resp., Dkt. 344, Ex. E at 225:10–18.
[34] Def.'s Resp., Dkt. 344, Ex. E at 217:4–226:5.
[35] Pl.'s Mem., Dkt. 343, Exs. 12, 13, 14, 17, 19, 23–28.
[36] Pl.'s Mem., Dkt. 343, Ex. 51 at 9; Dkt. 346 at 30:21–31:6 (Mar. 5, 2019).
[37] Def.'s Resp., Dkt. 344, Ex. E at 225:13–18.

### III.   2014 Tape Discovery

In November 2011, Barry Mukamal, filed suit against Defendant in the United States

Bankruptcy Court for the Southern District of Florida (the "*Palm Beach*" case).[38]  Mukamal was

acting in his capacity as trustee for certain trusts that had invested in the Petters' Ponzi scheme.[39]

Discovery in the *Palm Beach* case began in 2013.[40]

On June 13, 2014, Mukamal filed a motion for leave to file a second amended complaint

accusing Defendant of spoliation because of its destruction of "all electronic and paper versions

of all email relating in any way to [the Petters' Ponzi scheme] pre-dating 2005."[41]  On June 17,

2014, Mukamal served Defendant with a single interrogatory.[42]  The interrogatory cited a letter

from Jonathan Ingrisano, Defendant's counsel, to Mukamal stating that "[n]o regional email back

ups exist prior to March 2005, as they were all recycled in 2009 . . . ."[43]  The interrogatory asked

when and why Defendant's pre-2005 backup tapes were recycled.[44]

During the summer of 2014, in order to answer the interrogatory, Ingrisano

investigated.[45]  Ingrisano asked Vanderheyden to have someone search the Centre Point location

for any Minnesota regional backup tapes that had been sent for recycling in 2010 but that had not

been destroyed.[46]  Vanderheyden contacted David Scherer, an employee at the Centre Point

location, and asked him to search for any existing backup tapes.[47]

---

[38] *See generally Mukamal v. BMO Harris Bank, N.A.* (*In re Palm Beach Fin. Partners, L.P.*), Adv. No. 11-03015-BKC-PGH-A (Bankr. S.D. Fla.).
[39] *Id.*
[40] Def.'s Resp., Dkt. 344, Ex. L at ¶ 3.
[41] *Id.* at ¶ 10; *see* Pl.'s Mem., Dkt. 343, Ex. 35.  The *Palm Beach* plaintiff's motion was subsequently granted.  *Id.*
[42] Pl.'s Mem., Dkt. 343, Ex. 2.
[43] Pl.'s Mem., Dkt. 343, Ex. 2; *see* Def.'s Resp., Dkt. 344, Ex. L at ¶ 8.  In the letter, Ingrisano informed Mukamal that he estimated over 5,000 backup tapes exist, although none were regional email backup tapes predating March 2005.  Pl.'s Mem., Dkt. 343, Ex. 8.
[44] Pl.'s Mem., Dkt. 343, Ex. 2.
[45] Def.'s Resp., Dkt. 344, Ex. L at ¶¶ 11–12.
[46] *Id.* at ¶ 12.
[47] *See* Pl.'s Mem., Dkt. 343, Ex. 4, Ex. 5 at 14:1–15:23.

On August 26, 2014, Sherer discovered six Minnesota email backup tapes (the "2014 Tapes"). That same day, Vanderheyden sent an email to Ingrisano with the subject line "Tape search at CentrePoint" (the "2014 Email").[48] The 2014 Email reads:

> Dave [Sherer] looked in all the nooks and crannies over there today and found a total of (6) backup tapes from the Minnesota email server. The oldest one was MSP105 labeled 'Aug 07.'[49]

Neither Ingrisano nor Defendant took any action to determine what was on those tapes.[50] The 2014 Tapes were never searched, logged, or indexed.[51] The 2014 Email did not provide any identifying information for five of the six tapes.[52] Defendant did not tell anyone about the newly discovered 2014 Tapes, including Mukamal in the *Palm Beach* case.[53] Instead, three days after discovering the 2014 Tapes, Defendant responded to the *Palm Beach* interrogatory stating under oath that "all backup tapes for all decommissioned regional servers," which would include the Minnesota server, had been "disposed."[54] The individuals who signed and verified the interrogatory response were Ingrisano and Vanderheyden—two people who knew this response was false.[55]

Today, nobody can say what happened to the 2014 Tapes, what was on the 2014 Tapes, or whether they still exist.[56] The 2014 Tapes may have been destroyed.[57]

---

[48] *Id*. at Ex. 4.
[49] *Id*.
[50] Def.'s Resp., Dkt. 344, Ex. L at ¶¶ 12–13.
[51] Dkt. 268 at 71:20–72:5 (Apr. 5, 2018); Dkt. 280; *see* Def.'s Resp., Dkt. 344, Ex. L at ¶¶ 12–13.
[52] Pl.'s Mem., Dkt. 343, Ex. 4
[53] Def.'s Resp., Dkt. 344, Ex. L at ¶¶ 13–14.
[54] Pl.'s Mem., Dkt. 343, Ex. 2.
[55] *Id*.
[56] Pl.'s Mem., Dkt. 343, Ex. 5 at 16:14–25, 30:21–24; *see* Dkt. 280.
[57] Pl.'s Mem., Dkt. 343, Ex. 5 at 31:2–5.

## IV.    Discovery in this Adversary Proceeding

### A.    *Defendant's General Malfeasance*

The parties have engaged in substantial fact discovery since February 2017.  Fact discovery closed on January 31, 2018.[58]  During discovery, the parties collectively filed over ten formal motions to compel and made numerous requests of this Court to resolve discovery disputes informally.  The Court did two *in camera* reviews and resolved some disputes over the phone during depositions.  Throughout discovery, the Court reprimanded Defendant for willful discovery violations and warned Defendant about its aggressive discovery and delay tactics.  On January 8, 2018, the Court imposed discovery sanctions on Defendant in the amount of $6,000 for its willful failure to comply with an earlier order by submitting redacted and incomplete documents to the Court *in camera* review.[59]  The Court spent numerous hours on the review before discovering that pages were redacted and documents were not complete.

### B.    *2017 Tape Discovery*

In February 2017, Defendant's counsel re-initiated the search for any Minnesota email backup tapes.[60]  Counsel met with Ingrisano, Vanderheyden, and several current employees, including Sherer, about any potential other sources for the pre-2005 emails.[61]  Counsel followed up on several occasions.[62]  Counsel informed these individuals that they were searching for Minnesota backup tapes and that it was "very important to either find the tapes or confirm that no such tapes existed."[63]

---

[58] Dkt. 191.
[59] Dkt. 209; Dkt. 211 at 3:15–5:17, 11:20–12:4 (Jan. 8, 2018).
[60] Def.'s Resp., Dkt. 344, Ex. M at ¶ 7.
[61] *Id*. at ¶¶ 7–10.
[62] *Id*. at ¶ 9.
[63] *Id*. ¶¶ 7–10.

On December 11, 2017, Defendant's counsel once again spoke to Vanderheyden about the possible existence of any Minnesota backup tapes prior to his scheduled deposition on December 15, 2017.[64]  Vanderheyden advised counsel that there might be 2010 backup tapes from the Minnesota server at Centre Point.[65]  On December 14, 2017, Defendant's counsel asked Paul Stroble, a BMO technology services employee, to search Centre Point for any existing backup tapes.[66]  That same day, Stroble searched and found five Minnesota regional backup tapes (the "2017 Tapes").[67]  The tapes were labeled as follows:

"MSP105" & "Full System Backup, Aug 07"

"MSP 165" & "2008 EOY"

"MSP 161" & "Dec 2009, ME"

"MSP 196" & "Dec 2009, ME"

MSP126" & "Final AS/400 Backup Before Decommission, 9/24/10, MI-MSP-LNASMAIL01."[68]

The 2017 Tapes are the only known Minnesota backup tapes to exist.[69]  When Stroble found the 2017 Tapes, he also discovered four tapes with labels corresponding to the Milwaukee region and 36 tapes without labels.[70]  Defendant subsequently searched and produced relevant emails from several of these tapes.[71]

Despite locating the 2017 Tapes backup tapes on December 14, 2017, one day prior to Vanderheyden's deposition (which was focused on the tape destruction project), Defendant did

---

[64] *Id.* at ¶ 12.
[65] *Id.*
[66] *Id.* at ¶¶ 13–14.
[67] *Id.* at ¶ 14; *see* Dkt. 280.
[68] Def.'s Resp., Dkt. 344, Ex. H.
[69] Pl.'s Mem., Dkt. 343, Ex. 11.
[70] Def.'s Resp., Dkt. 344, Ex. H.
[71] Pl's Mem., Dkt. 343, Exs. 40, 41 at 7–9.

not inform _its own_ counsel about the discovery until over one month later—on January 18, 2018.[72]  Defendant's counsel did not inform Plaintiff about the 2017 Tapes until January 31, 2018—after close of business on the last day of discovery.[73]

Up until then, Defendant had repeatedly represented to Plaintiff and the Court that all Minnesota email backup tapes had been destroyed by January 2011.

In another failure to timely disclose, Defendant first produced the 2014 Email (describing the discovery of the 2014 Tapes) to _its_ counsel at Mayer Brown on February 2, 2018, after the close of discovery.[74]  It is unclear when Defendant knew about the 2014 email.[75]  Defendant's counsel knew about the existence of the 2014 Tapes by February 2, 2018 at the latest and yet three days later, Defendant told Plaintiff in Rule 30(b)(6) testimony that all Minnesota email backup tapes, other than the 2017 Tapes, had been destroyed between October 2010 and January 2011.[76]  This was false and counsel at Mayer Brown knew it.  Also on February 5, 2018, Plaintiff filed a letter with the Court requesting a status conference to address production of the 2017 Tapes.[77]  At the status conference held on February 21, 2018, Defendant was warned about its lack of credibility with the Court after the Court learned about Defendant's failure to timely disclose its discovery of the 2017 Tapes.[78]

## V.     April 5, 2018 Evidentiary Hearing

The Court set a hearing for April 5, 2018, to receive evidence on the scope, time necessary, and anticipated expenses in producing documents contained on the 2017 Tapes (the

---

[72] Def.'s Resp., Dkt. 344, Ex. M at ¶¶ 14–15.
[73] Dkt. 216.
[74] Pl.'s Mem., Dkt. 343, Ex. 37 at 4.  Defendant's counsel at Mayer Brown did not inform local counsel of the 2014 Email until over a month later on March 27, 2018.  _Id._ at 5.
[75] The Court notes that Ingrisano knew about the 2014 Email and 2014 Tapes in August 2014.  Ingrisano is listed as one of Defendant's attorneys in this adversary.  Def.'s Resp., Dkt. 344, Ex. L at ¶ 16.
[76] _Id._ at Ex. 38.
[77] Dkt. 217.
[78] Dkt. 226 at 27:24–28:3 (Feb. 21, 2018).

"April 5th Hearing").[79]  The Court also issued an Order to Show Cause to determine whether

Defendant should be sanctioned for its failure to timely notify Plaintiff of the 2017 Tapes'

existence and to produce documents that Defendant or its agent knew existed in 2014.[80]

At the April 5th Hearing, the Court found that Defendant had a continuing obligation to

supplement or correct its disclosures and discovery responses regarding the existence of any

Minnesota email backup tapes in a timely manner.[81]  Defendant knew that certain backup tapes

existed in August 2014.[82]  But despite this knowledge, Defendant certified in discovery

responses, and on multiple occasions, that all Minnesota backup tapes had been destroyed.[83]

Defendant offered several reasons for why it failed to search, preserve, and index the

backup tapes in 2014, all premised on a purported belief that the backup tapes did not contain

relevant information.  These reasons are belied by the facts no one had attempted to find out

what was on the 2014 Tapes.  The Court does not believe these reasons—no one could know if

the tapes did or did not contain any relevant information because no one looked at them.

Further, Defendant argued that the backup tapes did not contain relevant discoverable

information because it would have been duplicate of the information in the Legato system.[84]  As

admitted by Defendant's witnesses, however, Legato only kept copies of email, whereas the

backup tapes contained all files in a given mailbox, including email, calendars, attachments, and

other data.[85]  Defendant also argued that because one of the tapes was labeled with the year

2007, none of the backup tapes could have contained any emails predating March 2005.[86]  This

---

[79] Dkt. 241.
[80] *Id.*
[81] Dkt. 268 at 115:19–23 (Apr. 5, 2018).
[82] *Id.* at 17:1–8, 118:5–6.  At the time of the April 5th Hearing, the Court was unaware that the 2014 Tapes existed.
[83] *Id.* at 116:3–5; *see* Pl.'s Mem., Dkt. 343, Ex. 38.
[84] Dkt. 268 at 116:19–22, 118:6–9 (Apr. 5, 2018); *see* Dkt. 223; Dkt. 248.
[85] Dkt. 268 at 118:13–21 (Apr. 5, 2018).
[86] Dkt. 249; Dkt. 261.

theory is also contradicted by Defendant's own witnesses who testified that they knew in 2014 that the backup tapes could have pre-March 2005 emails.[87]

There can be no dispute that the 2017 Tapes contained relevant non-duplicative information unavailable from any other source.[88]

The Court determined that neither Defendant nor its counsel had substantial justification for refusing to review the backup tapes when first discovered in 2014.[89]  Defendant offered no logical reason for its failure to review the only existing Minnesota backup tapes that may have contained relevant information from before March 2005.[90]

Defendant failed to disclose the 2017 Tapes to its counsel until after Vanderheyden's deposition was taken.  Defendant offered no explanation as to why it waited over a month to do so.[91]  The Court found that Defendant's counsel should have immediately notified Plaintiff about the discovery on January 18, 2018.[92]  Defendant gave no explanation as to why it waited nearly two weeks, and only after the close of business on the last day of fact discovery, to do so.[93] Counsel's failure was especially egregious given the importance of the tapes.[94]  After the April 5th Hearing, the Court sanctioned Defendant for willful discovery abuses due to its delayed production of the 2017 Tapes.[95]

---

[87] Dkt. 268 at 51:7–13 (Sherer), 70:23–71:6 (Ingrisano); Pl.'s Mem., Dkt. 343, Ex. 5 at 59:6–61:6 (Vanderheyden).
[88] Dkt. 268 at 115:5–11 (Apr. 5, 2018); *see* Dkt. 248.
[89] Dkt. 268 at 116:14–16 (Apr. 5, 2018).
[90] *Id*. at 116:15–19.
[91] *Id*. at 119:1–22, 122:3–22.
[92] *Id*. at 119:1–22.
[93] *Id*.
[94] *Id*. at 119:17–18.
[95] *Id*. at 115:17–18, 119:21–22, 120:23–25, 122:11–17.

## VI.   Plaintiff Learns About the 2014 Tapes

At the April 5th Hearing, Defendant represented to the Court that all five of the 2017 Tapes were originally found in 2014 during the *Palm Beach* case.[96]  Prior to the hearing, Defendant had represented to Plaintiff and the Court on several occasions that it had found only one tape in 2014.[97]  Several of Defendant's declarations and certain testimony at the April 5th Hearing were vague about the number of tapes discovered in 2014—no one said that six tapes had been discovered.  Rather, Ingrisano's declaration swore that Defendant found "several Minnesota email backup tapes" in 2014 and then he testified that "only four or five tapes" were found in 2014 and "that there were, to the best of my recollection, five back-up tapes."[98]  But Ingrisano knew that six tapes had been discovered in 2014 as his testimony revealed he was familiar with the 2014 Email.[99]  Defendant's counsel knew for nearly two months before the April 5th Hearing that six tapes had been discovered in 2014.[100]  Counsel failed to set the record straight—Defendant and its counsel knew about the 2014 Email that described when, where, and how many tapes were found, two months before the April 5th Hearing.

Following the April 5th Hearing, Plaintiff asked Defendant to provide the labels for every backup tape found in 2014.[101]  Defendant admitted that it did not know the names of the tapes found in 2014 and was not aware of any index identifying them by name.[102]  On April 12, 2018,

---

[96] *Id.* at 17:22–18:2, 22:11–15 ("When these get discovered, essentially, for the second time in December of this year . . . .").

[97] Pl.'s Mem., Dkt. 343, Ex. 40 at 3 ("BMO found post-Legato-dated MN Server backup tapes at the time, *including one of the tapes that BMO just located in December 2017* (MSP 105, labeled "Aug. 07") (emphasis added); Dkt. 223 at 9 (same); Dkt. 232 (same).

[98] Dkt. 268 at 94:12–18, 103:13–15 (Apr. 5, 2018) (emphasis added); Def.'s Resp., Dkt. 344, Ex. L at ¶ 13 (emphasis added)

[99] Dkt. 268 at 70:11–15, 71:16–19 (Apr. 5, 2018).

[100] Defendant's counsel at Mayer Brown, however, submitted a declaration swearing that Ingrisano failed to disclose that "certain backup tapes from the Minnesota regional email server were discovered in August 2014."  Def.'s Resp., Dkt. 344, Ex. M at ¶ 7 (emphasis added).

[101] Pl.'s Mem., Dkt. 343, Ex. 33 at 8.

[102] *Id.* at 1, 7.

over two months after counsel at Mayer Brown first learned about the 2014 Email, Defendant

revealed its existence to Plaintiff.[103]  Defendant admitted that its knowledge regarding the

identity of the tapes found in 2014 came entirely from the 2014 Email and that, as a result, it

only knew the oldest tape was labeled MSP 105, "Aug. 07."[104]  On April 16, 2018, Plaintiff filed

a letter informing the Court about the 2014 Email and 2014 Tapes.[105]  In response, the Court

entered an order re-opening formal discovery to allow Plaintiff to serve additional document

requests and interrogatories and to take additional depositions.[106]

   The 2014 Email and resulting depositions revealed numerous contradictions in

Defendant's representations to the Court and to Plaintiff.[107]  At the April 5th Hearing the Court

had asked Defendant if it had somebody present who could testify about discovering the tapes in

2014 and what happened to the tapes after 2014.[108]  Despite the direct question, Defendant failed

to tell the Court that Scherer, who was present in the courtroom, had found the 2014 Tapes.[109]

Instead, when Scherer took the stand, he testified that "a different team" had dealt with backup

tapes, that he "didn't deal with the tapes," and "didn't touch them."[110]  This was false.  About

five months later, Scherer testified at his deposition that he knew about and had reviewed the

2014 Email prior to the April 5th Hearing.[111]  He also confirmed at his deposition that he was on

the team that found the 2014 Tapes.[112]  When asked about his testimony at the April 5th Hearing,

---

[103] *Id.* at 1.  Defendant would not produce the 2014 Email itself until several days later.
[104] *Id.* at 1; *see id.* at Ex. 4.
[105] Dkt. 277.
[106] Dkt. 283.
[107] *See infra* Parts IV(A)–(D) for additional inconsistencies.
[108] Dkt. 268 at 17:1, 17:19–21 (Apr. 5, 2018).
[109] Pl.'s Mem., Dkt. 343, Ex. 4; *see generally* Dkt. 268 (Apr. 5, 2018).
[110] Dkt. 268 at 50:5–12  (Apr. 5, 2018).
[111] Pl.'s Mem., Dkt. 343, Ex. 39 at 32:10–33:9.
[112] *Id.* at 93:5–10.

Scherer stated that "it didn't cross my mind" to tell the Court he had found the 2014 Tapes and that he had not thought to bring the matter up.[113]

Ingrisano also testified at the April 5th Hearing that he did not know who found the backup tapes in 2014 despite working with Scherer in the summer of 2014 to locate any existing Minnesota backup tapes and the fact that the 2014 Email—which was addressed to Ingrisano— referred to Scherer by name.[114]

A.    *Defendant's Same Tape Theory*

At the April 5th Hearing, Defendant's counsel advanced a theory that the backup tapes found in 2014 were re-discovered in December 2017.[115]  Defendant told the Court that it did not destroy any tapes found in 2014.[116]  Defendant insisted it had kept the tapes and argued that the issue was not about missing backup tapes but rather the scope of production from the 2017 Tapes.[117]  This was the first time Defendant argued that the 2014 Tapes and the 2017 Tapes are one in the same.

B.    *Defendant's Same Tape Theory – The Locked Cabinet*

Defendant expanded on its new theory in response to Plaintiff's letter informing the Court of the 2014 Tapes and 2014 Email.[118]  Defendant filed a letter on April 24, 2018, asserting that the 2014 Tapes were found in a locked, restricted access cabinet at the Centre Point location.[119]  To the best of Defendant's knowledge, the 2014 Tapes remained in the same cabinet from August 2014 to December 2017.[120]  Stroble purportedly found the 2017 Tapes in the same

---

[113] *Id.* at 91:16–92:5.
[114] Dkt. 268 at 69:9–13 (Apr. 5, 2018); *see* Pl.'s Mem., Dkt. 343, Ex. 4.
[115] Dkt. 268 at 22:11–15 (Apr. 5, 2018).
[116] *Id.* at 42:3–9.
[117] *Id.*
[118] Dkt. 277.
[119] Dkt. 280 at 2.
[120] *Id.*

locked, restricted access cabinet at Centre Point.[121]  Defendant told the Court there is no genuine

basis to conclude that the 2014 Tapes "were somehow lost or intentionally destroyed, and/or are

somehow different from the tapes found in 2017."[122]

Defendant made its "same locked cabinet" argument at least nine separate times in the

April 24th letter,[123] at least ten times in formal discovery responses and pleadings,[124] and argued

this point as fact to the Court on several occasions.  But the April 24th letter itself raises

questions about Defendant's theory as it stated that Defendant and its counsel could not confirm

that the 2017 Tapes were the same because the 2014 Tapes were never searched, logged, or

indexed.[125]

Further, when depositions were subsequently taken of each employee involved in finding

the 2014 Tapes and 2017 Tapes—Vanderheyden, Scherer, and Stroble[126]—no one could confirm

that the 2014 Tapes are the same as the 2017 tapes, no one could say where the 2014 Tapes were

found, and no one could say whether the 2014 Tapes still exist today.[127]

Scherer testified that:

- He had no reason to believe he did not look for and discover the six 2014
  Tapes;[128]

- He had no reason to believe that Vanderheyden's description of his discovery in
  the 2014 Email was inaccurate;[129]

---

[121] *Id.*
[122] *Id.* at 3.
[123] *See generally id.*
[124] Pl.'s Mem., Dkt. 343, Exs. 37, 41, 42; Dkt. 304; Dkt. 331 at 46:1–3 (June 27, 2018).
[125] Dkt. 280 at 3.
[126] *See generally* Pl.'s Mem., Dkt. 343, Exs. 5 (Vanderheyden), 39 (Scherer), 43 (Stroble).
[127] *Id.*
[128] Pl.'s Mem., Dkt. 343, Ex. 39 at 38:6–14.
[129] *Id.* at 38:16–39:3, 40:16–20.

- He had no recollection of the number of tapes he found in 2014, which tapes he found, where he found them, or what he did after finding them;[130] and

- He could not say one way or another that the 2014 Tapes and 2017 Tapes are the same.[131]

Vanderheyden testified that:

- He verified Defendant's interrogatory response in the *Palm Beach* case stating that all backup tapes for the decommissioned regional servers, including Minnesota, had been disposed;[132]

- Three days prior to verifying the interrogatory response, he sent Ingrisano the 2014 Email stating that Scherer found six Minnesota backup tapes;[133]

- He had no reason to believe that Scherer did not find six tapes in 2014;[134]

- He could not say where Scherer found the 2014 Tapes;[135]

- He never saw the 2014 Tapes and does not know what happened to them;[136] and

- The 2014 Tapes could have been destroyed.[137]

Finally, Stroble testified that while he found the 2017 Tapes in a restricted access cabinet at the Centre Point location, he did not know if it was the same one because he did not know what was

---

[130] *Id.* at 40:7–20, 47:18–49:10.
[131] *Id.* at 99:5–10.
[132] Pl.'s Mem., Dkt. 343, Ex. 5 at 26:13–27:18.
[133] *Id.* at 27:15–23.
[134] *Id.* at 14:2–15:15.
[135] *Id.* at 17:15–21.
[136] *Id.* at 16:14–17:3, 30:21–24.
[137] *Id.* at 31:2–5.

or was not done in 2014.[138]  Defendant's continued argument that the 2014 Tapes and the 2017

Tapes are the same has no factual support.[139]

     C.     *Defendant's Same Tape Theory – Scherer Only Discovered Five Tapes*

Defendant's April 24th letter attempted to cast doubt on the exact number of backup

tapes that were discovered in 2014.[140]  Defendant asserted it could not say now whether five or

six tapes were located.  This is not credible as the 2014 Email sent the same day as the tape

discovery stated that six tapes were found.[141]

     D.     *Defendant's Same Tape Theory – The Wisconsin Tape*

When Stroble found the five 2017 Tapes, he also discovered four tapes with labels

corresponding to the Milwaukee region and 36 tapes without labels.[142]  Given Stroble's findings,

Defendant argued to the Court that Scherer may have miscounted the number of Minnesota

backup tapes he discovered in 2014 by mistakenly including a Wisconsin tape in his count.[143]

This is not believable; no one would confuse 40 tapes with five or six tapes.

Defendant's letter also explained that the label on one of the backup tapes found in 2017

included the name of an AS400 Wisconsin-based server and that this tape was likely the sixth

tape Scherer found in 2014.[144]  Plaintiff requested Defendant to review the tape and, upon doing

so, Defendant learned that it did not contain a single email.[145]  However, at least one of the tapes

discovered in 2017 contained relevant emails, the tape labeled "BK7505."[146]

---

[138] Pl.'s Mem., Dkt. 343, Ex. 43 at 106:1–5.
[139] Def.'s Resp., Dkt. 344 at 24–26.
[140] Dkt. 280 at 3.
[141] *Id.*; Pl.'s Mem., Dkt. 343, Ex. 4.
[142] Def.'s Resp., Dkt. 344, Ex. H.
[143] *E.g.*, Dkt. 280 at 4.
[144] *Id.*; *see* Pl.'s Mem., Dkt. 343, Ex. 37 at 6–7.
[145] Pl.'s Mem., Dkt. 343, Ex. 37 at 12.
[146] Pl.'s Mem., Dkt. 343, Ex. 37 at 12, Ex. 41 at 7–8, Ex. 49 at 2, Ex. 50.

After being shown a picture of the BK7505 tape at his deposition, Scherer testified he could not tell just by looking at the photo whether the tape is associated with any particular server.[147]  Vanderheyden testified that Minnesota backup tapes would have been labeled with the prefix "MSP."[148]  This was common knowledge in Vanderheyden's department.[149]  Stroble, who found the 2017 Tapes, testified that the prefixes "BK" and "BRK" are indicative of tapes from Brookfield, WI and that Minnesota and Wisconsin backup tapes had different nomenclature.[150]  As discussed above, Vanderheyden and Scherer both testified that there is no reason to believe Scherer did not find six Minnesota backup tapes in 2014.  No one can say whether Scherer or Vanderheyden mistook a Wisconsin tape for a Minnesota tape.

E.    *Defendant's Remove the Same Tape Theory from Discovery Responses*

On September 12, 2018, Plaintiff filed a Motion to Strike Defendant's Unverified Response to Interrogatory No. 38, which concerned Defendant's discovery and disclosure of backup tapes in 2014 and 2017.[151]  Defendant's response incorporated its April 24th letter to the Court but did not separately verify the facts asserted in the letter under oath.[152]  Defendant's response continued to argue as fact its belief that the 2014 Tapes and 2017 Tapes were the same and made assertions that no employee could verify.[153]  Stroble provided a limited verification relating to his discovery of the 2017 Tapes but the remainder of the response was unverified attorney argument.[154]

---

[147] Pl.'s Mem., Dkt. 343, Ex. 39 at 108:4–14.
[148] Pl.'s Mem., Dkt. 343, Ex. 5 at 18:7–16.
[149] *Id.*
[150] Pl.'s Mem., Dkt. 343, Ex. 43 at 107:14–108:3.
[151] Dkt. 318.
[152] *Id.*
[153] *Id.*
[154] *See generally id.*

At the hearing on the motion to strike, the Court confirmed with Defendant's counsel that no one can verify that the tapes are the same.[155]  The Court then rejected Defendant's "same tapes" argument.  The Court found that, based on the record and testimony available, an interrogatory response could not state they are the same.[156]  The Court held that Defendant's counsel could not verify the interrogatory response.[157]  Defendant was ordered to either verify its response or remove the unverified arguments.[158]  Following the Court's order, Defendant removed any assertion that the 2014 Tapes and 2017 Tapes are the same from its discovery responses.[159]

The Court turns to the determination of whether the facts support a finding of spoliation meriting sanction under Rule 37(e).

## Discussion

### I.    Spoliation Under Rule 37

Spoliation is generally defined as the intentional destruction of evidence.[160]  The Federal Rules of Civil Procedure require parties to take reasonable steps to preserve relevant ESI in the anticipation or conduct of litigation.[161]  Courts may sanction a party if it fails to do so and the

---

[155] Dkt. 325 at 18:9–12 (Sept. 26, 2018).

[156] *Id.* at 14:22–15:1.

[157] Dkt. 323.

[158] *Id.*

[159] As a final point, Defendant argues that it was not hiding information because "why" would it then produce the 2014 Email and 2017 Tapes?  The Court cannot answer that except to say the stakes of not producing the information and later being found out were much higher than producing the information, albeit untimely.

[160] *E*Trade Sec. LLC v. Deutsche Bank AG*, 230 F.R.D. 582, 587 (D. Minn. 2005); *see Stevenson v. Union Pac. R.R. Co.*, 354 F.3d 739, 746 (8th Cir. 2004) (citing *Rodgers v. CWR Constr., Inc.*, 33 S.W.3d 506, 510 (Ark. 2000)).  This district has also defined spoliation as "the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation."  *Nicollet Cattle Co., Inc. v. United Food Grp., LLC*, Civil No. 08–5899 (JRT/FLN), 2010 WL 3546784, at *4 (D. Minn. Sept. 7, 2010) (citing *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 216 (S.D.N.Y. 2003)).

[161] Fed. R. Civ. P. 37(e).  Rule 37 is made applicable to adversary proceedings by Federal Rule of Bankruptcy Procedure 7037.

24

lost ESI cannot be restored or replaced through additional discovery.[162]  The imposition of sanctions under Rule 37 is within the Court's discretion.[163]

There are two overarching types of sanctions available under Rule 37(e).  First, if the opposing party is prejudiced by the offending party's spoliation, the Court may order commensurate measures to cure the prejudice.[164]  Second, and only upon a finding that the offending party "acted with the intent to deprive another party of the information's use in the litigation," the Court may presume that the evidence was unfavorable to the offending party and issue an adverse inference jury instruction.[165]  Courts are not required to impose the "least onerous sanction available, but may exercise its discretion to choose the most appropriate sanction under the circumstances."[166]

### A.    *Preliminary Elements*

Before turning to an analysis of whether sanctions are appropriate under Rule 37(e)(1) or 37(e)(2), the Court must address three preliminary elements:  1) whether Defendant had a duty to preserve ESI and, if so, when the duty was triggered; 2) whether Defendant took reasonable steps to preserve the ESI; and 3) whether the lost ESI can be restored or replaced through additional discovery.[167]

---

[162] Fed. R. Civ. P. 37(e).

[163] *Ramirez-Cruz v. Chipotle Servs., LLC*, No. 15–cv–4514–ADM–KMM, 2017 WL 8947191, at *2 (D. Minn. May 11, 2017) (citing *Stevenson*, 354 F.3d at 745).

[164] Fed. R. Civ. P. 37(e)(1); *see Paisley Park Enters., Inc. v. Boxill*, No. 17-cv-1212 (WMW/TNL), 2019 WL 1036058, at *3 (D. Minn. Mar. 5, 2019).

[165] Fed. R. Civ. P. 37(e)(2); *see Paisley Park Enters., Inc.*, 2019 WL 1036058, at *3.

[166] *E*Trade Sec. LLC*, 230 F.R.D. at 592 (citing *Keefer v. Provident Life & Acc. Ins. Co.*, 238 F.3d 937, 941 (8th Cir. 2000)).

[167] Fed. R. Civ. P. 37(e); *Ala. Aircraft Indus. v. Boeing Co.*, 319 F.R.D. 730, 740–42 (N.D. Ala. 2017); *see Paisley Park Enters., Inc.*, 2019 WL 1036058, at *3–6.

B.    *Preliminary Elements – Duty to Preserve*

Did Defendant have a duty to preserve the Minnesota backup tapes and, if so, when was

the duty triggered?[168] Yes, Defendant admits that it had a duty to preserve the tapes as evidence

that began no later than January 2010.[169] Defendant also admits that a duty to preserve was in

place by the time the backup tapes were destroyed as part of the decommissioning project.[170]

Vanderheyden, the individual overseeing the decommissioning project, received the litigation

holds.[171]

There is no dispute that a duty to preserve was in place both when the backup tapes were

destroyed in 2010 and 2011 as part of the decommissioning project and when the 2014 Tapes

were lost or destroyed.[172]

C.    *Preliminary Elements – Failure to Take Reasonable Steps*

Did Defendant take reasonable steps to preserve the backup tapes?  No.

Rule 37(e) requires Defendant to take reasonable steps to ensure the preservation of

relevant evidence.[173]  Defendant advances several reasons for why its decision to destroy the

---

[168] A duty to preserve evidence begins "when a party knows or should have known that the evidence is relevant to future or current litigation."  *E*Trade Sec., LLC*, 230 F.R.D. at 587–88 (citing *Stevenson*, 354 F.3d at 746); *see* Fed. R. Civ. P. 37(e) (referring to ESI that "should have been preserved in the anticipation or conduct of litigation").
[169] Dkt. 346 at 30:21–31:6 (Mar. 5, 2019).  As the Court stated at oral argument, Defendant was on notice that anything relating to Petters needed to be saved when Judge Montgomery issue the Injunction Order.  *Id.* at 28:7–29:7.  The Injunction Order enjoined third party financial and banking institutions, such as Defendant, from disposing of any material "business, corporate, foundation, banking, financial, and/or accounting records in their possession" related to Petters, PCI, and other affiliated entities. On that same day and in the weeks that followed, Defendant sought advice from counsel concerning the Injunction Order and retention of Petters and PCI-related documents.  At that time, Defendant knew or reasonably should have known that the backup tapes would be relevant to future litigation involving Petters.  For purposes of this opinion, a finding that Defendant's duty arose no later than January 2010 covers the entire period over which the backup tapes were destroyed.
[170] Dkt. 346 at 30:21–31:6 (Mar. 5, 2019) ("Whatever the extent of Judge Montgomery's order, we are not arguing that by the time of the recycling of the tapes in 2010 there was no preservation obligation.  We've cited to the hold notice that was issued in January 2010.  It went to John Vanderheyden.  It [sic] was a guy that ran the recycling.").
[171] Pl.'s Mem., Dkt. 343, Ex. 51 at 9; *see* Dkt. 346 at 30:21–31:6 (Mar. 5, 2019).
[172] This adversary proceeding was filed on November 14, 2012, and was well underway by the time the 2014 Tapes were discovered and subsequently lost or destroyed.
[173] Fed. R. Civ. P. 37(e); *Paisley Park Enters., Inc.*, 2019 WL 1036058, at *4.

Minnesota backup tapes in 2010 and 2011 and its failure to preserve the 2014 Tapes was
reasonable.

1.      2010 and 2011 Destruction

First, Defendant argues that the tapes were recycled as part of the "long-planned"
regional server decommissioning project.  This argument has no factual support.  The project did
not begin until June 2009, which was months after Defendant received the Injunction Order.[174]
Further, the litigation holds were in place prior to the destruction of the tapes.  Finally,
Vanderheyden admitted that a litigation hold would have superseded even a standard retention
policy for backup tapes, including their recycling and destruction.[175]  Here, the destruction was
not pursuant to a routine policy.  Rather, it was a "one time only" event encompassing all the
existing email backup tapes for the Minnesota regional server prior to decommissioning.[176]

Second, Defendant argues that Vanderheyden and the Lotus Notes team reasonably
believed the backup tapes were no longer needed after the regional servers were taken offline
because 1) the only purpose of the tapes was to provide a way to repopulate the servers in the
event of a disaster, and 2) after its implementation, Legato became the "go-to location" for
pulling emails in response to litigation holds.

Defendant's argument that there was a reasonable belief that the tapes were not needed is
belied by Vanderheyden's acknowledgement that he knew it was possible that email backup
tapes existed from the Minnesota region that predated Legato and that he knew that the Legato

---

[174] Def.'s Resp., Dkt. 344, Ex. E at 191:17–24, 193:12–194:7.
[175] Pl.'s Mem., Dkt. 343, Ex. 9 at 189:18–191:14.  Principles of standard reasonableness required Defendant to
suspend its routine retention and destruction policies once the duty to preserve relevant ESI was triggered in January
2010.  *See Ramirez-Cruz*, 2017 WL 8947191, at *4.
[176] *See supra* Part II(B).

system did not preserve all information that the backup tapes would have preserved.[177]  The backup tapes were the only source of this data; the failure to prevent their destruction was unreasonable.[178]

Here Defendant's actions regarding the 2010 and 2011 backup tape destruction were not reasonable.[179]  It carefully planned and executed a decommissioning project, which included the destruction of all Minnesota backup tapes.  Further, Defendant destroyed the tapes without assessing what was on them, and without input from counsel, notwithstanding the two litigation holds and an order enjoining the destruction of evidence.[180]

### 2.     2014 Tapes Disappear

The failure to preserve the 2014 Tapes is also unreasonable.  When the tapes were discovered in August 2014, this adversary proceeding was well under way as were other proceedings arising out of Defendant's relationship with Petters and PCI.  The only reason Defendant was looking for Minnesota backup tapes in 2014 was to locate pre-March 2005 emails in response to the spoliation claims in *Palm Beach*.[181]  The Injunction Order had been in place for years, as had two formal litigation holds.  Defendant should have preserved, indexed and searched the 2014 Tapes to determine whether they contained relevant ESI.  Now no one knows if they still exist.

---

[177] Def.'s Resp., Dkt. 344, Ex. E at 180:15–181:22.  The Court previously determined that Legato only kept copies of email, whereas the backup tapes contained all files in a mailbox, including email, calendars, attachments, and other data.  Dkt. 268 at 118:13–21 (Apr. 5, 2018).
[178] *See* Pl.'s Mem., Dkt. 343, Ex. 2.
[179] The Court will discuss willfulness below.
[180] Pl.'s Mem., Dkt. 343, Ex. 1; Def.'s Resp., Dkt. 344, Ex. E at 217:4–226:5.
[181] Pl.'s Mem., Dkt. 343, Ex. 5 at 33:18–35:19, Ex. 35; Def.'s Resp., Dkt. 344, Ex. L at ¶¶ 10–13.

The Court previously found that Defendant failed to provide any logical reason for its decision not to review the tapes discovered in 2014.[182]  Defendant's failure to, at a minimum, preserve, search, and index the 2014 Tapes were unreasonable.

Finally, Defendant's argument that there is no evidence that the 2014 Tapes were lost or destroyed fails.  No one knows what happened to the 2014 Tapes and it was Defendant's duty to preserve them.[183]

The Court finds that Defendant failed to take reasonable steps to preserve the Minnesota regional backup tapes in 2010 and 2011 and again after 2014.

D.     *Preliminary Elements – Ability to Restore or Replace the Lost ESI*

Can the ESI contained on the backup tapes be restored or replaced through additional discovery?  No.

As ESI often exists in several locations, the loss from one source may be harmless when the same information can be found elsewhere.[184]  For instance, if emails are lost from one custodian's inbox but remain available in the records of another, Rule 37 sanctions are unavailable.[185]  Here, it is undisputed that the Minnesota regional backup tapes from 2010 and 2011 and the 2014 Tapes are either lost or destroyed and, as a result, cannot be restored.  The only issue is whether the lost ESI can be replaced through additional discovery.

As a threshold matter, no one can say what was on the backup tapes.  The tapes were the only source of Defendant's emails predating March 2005.[186]  Defendant offers only speculation to

---

[182] Dkt. 268 at 116:14–19 (Apr. 5, 2018).
[183] Dkt. 280; Pl.'s Mem., Dkt. 343, Ex. 5 at 16:14–25, 30:21–24.  As Vanderheyden testified, the 2014 Tapes could have been destroyed.  Pl.'s Mem., Dkt. 343, Ex. 5 at 31:2–5.

[184] Fed. R. Civ. P. 37, Notes of Advisory Committee on Rules–2015 Amendment.
[185] *Paisley Park Enters., Inc.*, 2019 WL 1036058, at *6 (citing *CAT3, LLC v. Black Lineage, Inc.*, 164 F. Supp. 3d 488, 497 (S.D.N.Y. 2016)).
[186] *See* Pl.'s Mem., Dkt. 343, Ex. 2.

support its contention that unique, relevant emails were not on the backup tapes or were otherwise

available from other sources, as Defendant failed to take reasonable steps to preserve, search, and

index the tapes.  No one knows what was lost and when lost ESI is not identifiable, it generally

cannot be restored or replaced.[187]

Here, the information cannot be restored through deposition testimony of Defendant's

employees.  During their depositions, Defendant's relationship managers for the Petters

accounts—Ed Jambor and Chris Flynn—repeatedly testified that they could not remember or did

not know both basic and important facts.[188]  Defendant's anti-money laundering team testified

that they could not remember basic facts about their reviews of the PCI Account.[189]

Defendant argues that the information has been replaced as "millions of pages of

documents" have been produced and dozens of depositions have been taken in this adversary

proceeding.[190]  This is a red herring.  Defendant does not get to select what evidence it wants to

produce or from what sources.[191]  The Federal Rules require a party to produce all responsive

documents.[192]  Regardless of how many millions of pages of documents have been produced from

various third parties and other sources, the appropriate focus here is whether the information

contained on the destroyed backup tapes can be replaced.  While it may be true that Plaintiff

obtained some pre-March 2005 emails from other sources, this does not mean that all responsive

emails have been recovered or that a complete record of Defendant's pre-2005 emails is now

---

[187] *Ala. Aircraft Indus., Inc.*, 319 F.R.D. at 742–43 ("Because the information at issue is not even identifiable . . . the allegedly spoliated ESI cannot be restored or replaced through additional discovery."); *see Paisley Park Enters., Inc.*, 2019 WL 1036058, at *6 (noting that it is impossible to know what was communicated in deleted text messages and, as a result, finding that "the missing text messages cannot be replaced or restored by other sources").
[188] Pl.'s Mem., Dkt. 343, Stacey Decl. at ¶ 6.
[189] *Id*. at ¶ 7.
[190] Def.'s Resp., Dkt. 343 at 1–2, 10–11.
[191] *See Paisley Park Enters., Inc.*, 2019 WL 1036058, at *5.
[192] *Id*. (citing Fed. R. Civ. P. 26(c)).

available.[193]  Given the sheer quantity of backup tapes destroyed, it is unlikely that all or even

most information contained on the tapes has been produced by third parties, especially going back

10 years.  Even if the emails were cumulative to some extent, Plaintiff only has access to a small

sample of Defendant's communications predating March 2005 rather than a complete record that

should have been produced.[194]

Because no one can say what was on the tapes and due to the quantity of tapes destroyed,

the lost ESI cannot be restored or replaced from other sources through additional discovery.  The

three preliminary elements of Rule 37(e) are met.

## II.    Rule 37(e)(1)

Having determined that Defendant had a duty to preserve the backup tapes, failed to take

reasonable steps to do so, and that the information stored on the backup tapes cannot be restored

or replaced through additional discovery, the Court must determine what sanctions, if any, are

appropriate.

Sanctions under Rule 37(e)(1) require a showing of prejudice.[195]  If Plaintiff has been

prejudiced by the spoliation of evidence, the Court may order whatever measures are necessary

to cure the prejudice.[196]  Prejudice exists when the spoliation prohibits a party from presenting

relevant evidence.[197]  Contrary to Defendant's assertion at oral argument, Rule 37(e)(1) does not

always place the burden of proving or disproving prejudice on one party or the other.[198]  The

Advisory Committee Notes acknowledge that, in some circumstances, determining the content of

---

[193] *See Paisley Park Enters., Inc.*, 2019 WL 1036058, at *6.
[194] *See id.* (citing *First Fin. Sec., Inc. v. Lee*, No. 14-cv-1843, 2016 WL 881003, at *5 (D. Minn. Mar. 8, 2016)).
[195] Fed. R. Civ. P. 37(e)(1).
[196] *Id.*
[197] *Paisley Park Enters., Inc.* 2019 WL 1036058, at *7.
[198] Fed. R. Civ. P. 37, Notes of Advisory Committee on Rules–2015 Amendment; *see* Dkt. 346 at 32:3–7 (Mar. 5, 2019).

lost ESI will be difficult and placing the burden of proving prejudice on the non-spoliating party

may be unfair.[199]   Courts have the discretion under Rule 37(e)(1) to determine how to assess

prejudice on a case-by-case basis.[200]   Notably, courts in this district have found that a party's

claim of lack of prejudice is unconvincing when it is impossible to determine what information

had been destroyed.[201]   That is exactly the situation here—it is impossible to determine what

information has been destroyed.

There is no doubt Plaintiff is prejudiced by the loss of the Minnesota regional backup

tapes.   Defendant has no knowledge of what was on the backup tapes.   No one knows how

significant the backup tapes may have been to Plaintiff's case.   Defendant's actions have made it

impossible to determine the content of the backup tapes and placing the burden of proving

prejudice on Plaintiff under these circumstances is unfair.   Defendant's argument that there is a

lack of prejudice is unconvincing.[202]

Further, prejudice can be shown when the destroyed ESI may have contained relevant

information.[203]   The fact that documents produced from other sources and third parties may have

been part of the lost or destroyed ESI or is cumulative, does not show a lack of prejudice.[204]

---

[199] Fed. R. Civ. P. 37, Notes of Advisory Committee on Rules–2015 Amendment.
[200] *Id.*; *see Ala. Aircraft Indus., Inc.*, 319 F.R.D. at 743 (citing Fed. R. Civ. P. 37, Notes of Advisory Committee on Rules–2015 Amendment).
[201] *Paisley Park Enters., Inc.* 2019 WL 1036058, at *7 (finding defendants' claim of no prejudice as wholly unconvincing when neither the court nor plaintiffs could know what ESI had been lost or how significant the ESI would have been to the litigation); *Multifeeder Tech., Inc. v. British Confectionery Co., Ltd.*, No. 09–1090 (JRT/TNL), 2012 WL 4135848, at *3, *7–8 (D. Minn. Sept. 18, 2012) (adopting portion of report and recommendation finding prejudice as neither the court nor plaintiff would ever know what information had been destroyed and rejecting defendant's argument of lack of prejudice because no evidence shows that relevant files had been deleted).
[202] *Paisley Park Enters., Inc.* 2019 WL 1036058, at *7; *see Stevenson*, 354 F.3d at 748 (finding prejudice where the lost evidence was the only contemporaneous recording available); *Multifeeder Tech., Inc.*, 2012 WL 4128385, at *23 (finding prejudice where no one could ever know what ESI was destroyed).
[203] *See Stevenson*, 354 F.3d at 748 (finding prejudice despite no indication that the destroyed evidence could be considered a "smoking-gun" and where the destroyed evidence was the only contemporaneous record of conversations related to the accident at issue); *E*Trade Sec. LLC¸* 230 F.R.D. at 592 (finding prejudice where a party failed to preserve email backup tapes leading to the destruction of "potentially relevant evidence").
[204] *Paisley Park Enters., Inc.* 2019 WL 1036058, at *6.

Rather, it can never be known whether the information is cumulative because it is impossible to know what Defendant lost or destroyed. Instead, Plaintiff has been forced to gather information from other sources.[205]

Finally, it is highly likely that the lost or destroyed tapes contained relevant information, given the fact that the tapes contained nearly all of Defendant's emails predating March 2005, which would encompass significant years of Defendant's relationship with Petters and PCI. Emails and documents produced from the 2017 Tapes and other third parties contained unique and relevant information including correspondence about deposit account control agreements that Defendant was involved in with Petters.[206] Defendant itself has acknowledged relevance of the pre-March 2005 materials.[207] Caroline Moline, one of Defendant's witnesses and a business banker during the time in question, testified that the best source of information as to Defendant's knowledge at the time would have been emails.[208] And while there is no concrete indication that the backup tapes contained evidence that could be considered a "smoking-gun," that is not the standard. The fact that the tapes were the primary, if not only, source of Defendant's pre-March 2005 emails renders its loss prejudicial.[209]

## III.    Rule 37(e)(2)

Having found that sanctions are appropriate under Rule 37(e)(1), the Court must now consider whether an adverse inference instruction is appropriate under Rule 37(e)(2). To impose

---

[205] Defendant's witnesses from the period in question have not aided Plaintiff in this effort, having consistently testified that they do not know or do not recall even the most basic facts about their interactions with Petters and PCI.
[206] *E.g.*, Pl.'s Mem., Dkt. 343, at Exs. 12, 13, 14, 17, 19, 23–28.
[207] Def.'s Resp., Dkt. 344 at 22–23.
[208] Pl.'s Mem., Dkt. 343, Ex. 16 at 25:5–11.
[209] *Stevenson*, 354 F.3d at 748.

sanctions under Rule 37(e)(2), the Court must find that Defendant intended to deprive Plaintiff of the ability to use the information on the backup tapes in this adversary proceeding.[210]

In the Eighth Circuit, cases involving spoliation requires courts to make two findings before an adverse inference instruction is warranted.[211]  First, there must be prejudice to the opposing party.[212]  As discussed in detail above, the Court finds that Defendant's spoliation of the backup tapes prejudiced Plaintiff.

The second required finding is whether the spoliation or destruction of the backup tapes was intended to deprive Plaintiff of their use in this adversary proceeding.[213]  Negligent or even grossly negligent conduct is insufficient to support an adverse inference instruction under Rule 37(e)(2).[214]  Defendant emphasizes the 2015 amendment to Rule 37(e)(2), which provided that an adverse inference is not warranted absent a finding of intent to deprive another party of the information's use in litigation.  Plaintiff does not dispute this requirement.

Intent is rarely proved by direct evidence.[215]  Courts have "substantial leeway to determine intent through consideration of circumstantial evidence, witness credibility, motives of the witnesses in a particular case, and other factors."[216]  In considering these factors, courts may look to how the party acted throughout litigation and during discovery disputes, including whether there is a credible explanation for the party's failure to preserve relevant ESI.[217]

---

[210] Fed. R. Civ. P. 37(e)(2).

[211] *Hallmark Cards, Inc. v. Murley*, 703 F.3d 456, 460 (8th Cir. 2013) (citing *Stevenson*, 354 F.3d at 746, 748).

[212] *Id.*

[213] *Id.*; *see Auer v. City of Minot*, 896 F.3d 845, 858 (8th Cir. 2018).

[214] Fed. R. Civ. P. 37, Notes of Advisory Committee on Rules–2015 Amendment; *see* Fed. R. Civ. P. 37(e)(2); *Auer*, 896 F.3d at 858 (finding negligent conduct insufficient); *Morris v. Union Pac. R.R.*, 373 F.3d 896, 901 (8th Cir 2004).

[215] *Morris*, 373 F.3d at 901.

[216] *Id.* at 901.

[217] *See Paisley Park Enters., Inc*., 2019 WL 1036058, at *7 (evaluating defendants' conduct throughout the litigation); *BankDirect Capital Fin., LLC v. Capital Premium Fin., Inc.*, No. 15 C 10340, 2018 WL 1616725, at *1–2 (N.D. Ill. Apr. 4, 2018) ("[A] combination of events, each of which seems mundane when viewed in isolation, may present a very different picture when considered together."); *Moody v. CSX Transp., Inc.*, 271 F. Supp. 3d 410, 431–32 (W.D.N.Y. 2017) (finding intent based on defendants' actions in the litigation that allowed evidence to be

Although a party can prove intent indirectly, there must be evidence of a "serious and specific sort of culpability" regarding the lost ESI.[218]  Analyzing intent under Rule 37(e)(2) is a highly contextual exercise.[219]

In the Eighth Circuit, some cases require a finding of bad faith before imposing any spoliation sanctions, while others do not.[220]  In determining bad faith or serious culpability regarding the destruction of evidence, timing of when the destruction occurred may bear on whether a finding of bad faith is required.[221]  When evidence is destroyed after litigation has commenced, most cases state that no explicit finding of bad faith is required.[222]  For pre-litigation destruction of evidence, the heightened requirement of bad faith is required.[223]  Either way, failure to preserve some types of ESI while destroying others is a reasonable basis to conclude bad faith.[224]

Here, there is no direct evidence of an intent to deprive Plaintiff's use of the backup tapes in this adversary.  However, the circumstantial evidence, motive, lack of credibility, and

---

overwritten and destroyed); *Ottoson v. SMBC Leasing & Fin., Inc.*, 268 F. Supp. 3d 570, 581–82 (S.D.N.Y. 2017) (considering plaintiff's conduct throughout the litigation and during discovery disputes); *Ala. Aircraft Indus.*, 319 F.R.D. at 746–47 (imposing Rule 37(e)(2) sanctions where "unexplained, blatantly irresponsible behavior" led to the destruction of ESI); *O'Berry v. Turner*, Nos. 7:15-CV-0064-HL, 7:15-CV-00075-HL, 2016 WL 1700403, at *3–4 (M.D. Ga. Apr. 27, 2016) (citing defendants' "irresponsible and shiftless behavior" during discovery and throughout litigation); *Jackson Family Wines, Inc. v. Diageo N. Am., Inc.*, 2014 WL 595912, at *6 (N.D. Cal. Feb. 14, 2014) ("Defendants' conduct since they learned about the destruction qualifies as circumstantial evidence of such bad faith."); *Philips Elecs. N. Am. Corp. v. BC Tech.*, 773 F. Supp. 2d 1149, 1209–10, 1215–16 (D. Utah 2011) (finding an adverse inference to be warranted given defendant's "inexcusable behavior" for "filing false sworn declarations, giving testimony riddled with lies and deceit, and making false representations to this court").
[218] *Auer*, 896. F.3d at 858.
[219] *Morris*, 373 F.3d at 902–03.
[220] *Compare Greyhound Lines, Inc. v. Wade*, 585 F.3d 1032, 1035 (8th Cir. 2007) (requiring bad faith) *with Stevenson*, 354 F.3d at 745, 750 (upholding an adverse inference instruction for spoliation during litigation and discovery without an explicit finding of bad faith).
[221] *Ramirez-Cruz*, 2017 WL 8947191, at *4 (collecting cases).
[222] *Gallagher v. Magner*, 619 F.3d 823, 845 (8th Cir. 2010) (citing *Stevenson*, 354 F.3d at 749–50); *see Ramirez-Cruz*, 2017 WL 8947191, at *3–4 (collecting cases).
[223] *Hallmark Cards Inc.*, 703 F.3d at 461; *E*Trade Sec. LLC*, 230 F.R.D. at 588–89.  The *E*Trade* case also provides that if the destruction occurs after litigation is imminent, no showing of bad faith is required.  *Id.*
[224] *Paisley Park Enters., Inc.*, 2019 WL 1036058, at *5.

dishonesty with the Court leads to no other conclusion here but to find bad faith and an intent to bury or destroy the evidence to prevent its use:

1. Defendant destroyed the 60 backup tapes in 2010, as part of a one-time only plan, not as part of its routine maintenance;

2. Defendant knew about the Injunction Order and two legal holds in place at the time the tapes were destroyed. The backup tapes were destroyed well after Defendant anticipated litigation, as evidenced by its own privilege log entries and formal litigation holds;

3. Despite the existing duty to preserve, Defendant failed to A) take any steps to prevent the recycling of the final Minnesota backup tapes, B) undertake any effort to assess what was on the tapes prior to their destruction, C) look for pre-Legato email backup tapes in response to the litigation holds, and D) seek input from counsel;

4. At the time of the decommissioning project, Vanderheyden knew email backup tapes could exist from the Minnesota region that predated Legato; and

5. Defendant knew that the regional backup tapes were the only source of its emails predating March 2005.

The most logical conclusion from this set of circumstances is that Defendant intentionally destroyed the approximately 60 Minnesota backup tapes to prevent their use by Plaintiff in anticipated litigation. This conclusion is supported by the fact that the backup tapes were not destroyed as part of a standard retention and destruction policy. Defendant argues that deviation from its retention policies is not evidence of any bad faith intent.

36

But a party cannot "blindly destroy documents and expect to be shielded by a seemingly innocuous document retention policy."[225]

The Court may also consider Defendant's other actions in this case.[226]  Defendant has failed to be candid with the Court and Plaintiff; instead Defendant has obfuscated facts, failed to give the Court information after a direct request, and mislead the Court.

No credible explanation has been given as to why the 2014 Tapes were not preserved. Neither Defendant nor its counsel had substantial justification for refusing to review the only existing Minnesota backup tapes that could have contained emails from before March 2005.

Next, Defendant falsified its interrogatory response in the *Palm Beach* case and failed to disclose the existence of the 2014 Tapes when discovered.  Ingrisano and Vanderheyden signed and verified Defendant's interrogatory a mere three days after discovering the 2014 Tapes stating that "all backup tapes for all decommissioned regional servers," which would include the Minnesota backup tapes, had been "disposed."[227]  For nearly four years between August 26, 2014 and April 2018, Defendant remained silent and failed to disclose the existence of 2014 Tapes.  Instead, Defendant repeatedly claimed that all Minnesota email backup tapes had been destroyed by 2010 and 2011.[228]  In this case, when the existence of the 2014 Tapes, by way of the 2014 Email, came to light, Defendant submitted a letter to the Court which made the unbelievable assertion that the 2014 Email was not relevant to either the adversary proceeding or Plaintiff's document requests.[229]  Defendant's letter underscores its failure of candor.

---

[225] *E*Trade Sec. LLC*, 230 F.R.D. at 589 (citing *Lewy v. Remington Arms Co.*, 836 F.2d 1004, 1112 (8th Cir. 1988)).
[226] *See supra* note 217.
[227] Pl.'s Mem., Dkt. 343, Ex. 2.
[228] *E.g.*, Pl.'s Mem., Dkt. 343, Ex. 38 at 4.
[229] Dkt. 280 at 4.

Defendant's actions surrounding the 2017 Tapes are perhaps the most egregious of all.

After a request from counsel to search again for tapes in preparation for depositions, Defendant

discovered the existence of the 2017 Tapes—the only Minnesota email backup tapes known to

have survived destruction—on December 14, 2017.  The 2017 Tapes were discovered the day

before Vanderheyden's deposition was to take place.  Without explanation, Defendant waited for

over a month to disclose the 2017 Tapes to its <u>own</u> counsel.  Defendant finally informed its

counsel about the 2017 Tapes on January 18, 2018.  But without explanation, Defendant's

counsel did not disclose the existence of the 2017 Tapes until 8:46 PM on January 31, 2019, <u>after</u>

<u>close of business</u> on the last day of fact discovery.  Thus, Plaintiff did not learn about the 2017

Tapes until more than six weeks after Defendant made the initial discovery.  The Court

sanctioned Defendant for willful discovery abuses involving the 2017 Tapes.[230]

Two days after the disclosure of the 2017 Tapes, on February 2, 2019, Defendant for the

first time disclosed the 2014 Email to Mayer Brown.  No explanation has been given as to why

Defendant did not provide Mayer Brown with the 2014 Email before then.  But three days later,

on February 5, 2019, Defendant told Plaintiff in sworn Rule 30(b)(6) testimony that all

Minnesota email backup tapes, other than the 2017 Tapes, had been destroyed between October

2010 and January 2011.[231]  This was false and Defendant's counsel knew it was false.

The Court then held the April 5th Hearing regarding the production of the 2017 Tapes.

By that time, Defendant and Defendant's counsel knew that six Minnesota tapes had been

discovered in August 2014 by Scherer, at the direction of Vanderheyden and Ingrisano.  When

the Court asked Defendant if it had somebody present at the hearing who could testify about

---

[230] In between Defendant's discovery of the 2017 Tapes and disclosing this information to its own counsel, the Court
entered an order for sanctions against Defendant for its willful failure to comply with the Court's December 20,
2017 order on a motion to compel brought by Plaintiff and related to Suspicious Activity Report material. Dkt. 209.
[231] Pl.'s Mem., Dkt. 343, Ex. 38 at 4.

discovering the backup tapes in 2014, Defendant chose not to tell the Court that Scherer, who

was in the courtroom, found the tapes.  Scherer then took the stand and falsely stated that "a

different team" dealt with backup tapes, that he "didn't deal with the tapes," and "didn't touch

them," despite having reviewed the 2014 Email before testifying.[232]  Sherer later confirmed at his

deposition that he found the 2014 Tapes.  When asked about his testimony, Scherer claimed that

"it didn't cross my mind" to tell the Court he found the 2014 Tapes.[233]  Ingrisano, who also

reviewed the 2014 Email before taking the stand, falsely testified that he did not know who

found backup tapes in 2014.[234]

Defendant also gave vague and false testimony about the number of tapes it discovered in

2014.  Prior to the April 5th Hearing, the Court had been led to believe that there was only one

tape.  If Defendant held a genuine belief that the 2014 Tapes were the same as the 2017 Tapes, it

would have just said so instead of providing vague responses about the number of tapes.  The

Court finds that Defendant intended to mislead both Plaintiff and the Court about the number of

tapes it discovered in 2014 at the April 5th Hearing.

Defendant's argument as to why Rule 37 sanctions are not warranted for the loss of the

2014 Tapes is based on its theory that the 2014 and 2017 Tapes are the same.  This is speculative

at best.  Defendant cannot prove that they are the same because:

1. Defendant failed to preserve, search, or index the 2014 Tapes;

2. No one can say what was on the 2014 Tapes;

3. No one can confirm as fact that the tapes are the same;

4. No one can say where exactly the 2014 Tapes were found; and

---

[232] Dkt. 368 at 50:5–12  (Apr. 5, 2018); *see* Pl.'s Mem., Dkt. 343, Ex. 39 at 32:10–33:9.
[233] Pl.'s Mem., Dkt. 343, Ex. 39 at 91:16–92:5.
[234] Dkt. 268 at 69:9–13 (Apr. 5, 2018).

5.   No one can say where the 2014 Tapes are today or if they still exist today.

Since the beginning of 2018, the Court has found that Defendant's actions involving the Minnesota backup tapes were carried out in bad faith and constituted willful discovery abuses. Defendant's actions, obfuscation, consistent failures to be forthright, ever changing testimony, and frequent misrepresentations allow the Court to reasonably infer that its actions are a continuation of bad faith behavior and of an intent to keep the information on the Minnesota backup tapes away from Plaintiff and others dating back to, at the latest, 2010. Defendant's actions are not negligent or even grossly negligent—they are intentional and willful.

To this point, Defendant argues that in order to find a bad faith intent for the destruction of the 2014 Tapes, the following would have to be true:  1) Defendant learned that Minnesota backup tapes were found in 2014; 2) Defendant believed there was inculpatory evidence on those tapes; 3) Defendant obtained access to the tapes; and 4) Defendant hid or destroyed the tapes. This scenario is quite plausible and, in fact, is likely given the events discussed above.

In addition, as this Court has stated on numerous occasions, Defendant has failed to be candid and has fought discovery at every step.  This is shown by the number of discovery motions, and the fact that defendant produced redacted and incomplete records to the Court for an *in camer*a review.  The fact that Defendant did not tell <u>its own</u> counsel about the 2017 Tapes until after Vanderheyden's deposition on the subject of backup tapes was taken also shows bad faith and the intent to hide evidence.

There is one other fact to be considered in this case: Plaintiff is seeking billions of dollars in damages.  Given the amount involved and overwhelming circumstantial evidence of bad faith, the Court can only draw one logical conclusion: Defendant intentionally destroyed approximately 60 Minnesota backup tapes in 2010 and 2011 and lost or destroyed six backup

tapes in 2014 in bad faith and in order to deprive Plaintiff's use of the tapes in this adversary

proceeding.  No other reasonable explanation can account for Defendant's actions.  The Court

finds that an adverse inference jury instruction is warranted under Rule 37(e)(2).

## IV.    Requested Remedies

Plaintiff asserts that Defendant's spoliation warrants several different remedies.  In

addition to an adverse inference jury instruction under Rule 37(e)(2), Plaintiff requests the Court

to impose three additional remedies to cure Plaintiff's prejudice under Rule 37(e)1).

First, that Defendant should be precluded from offering testimony about its knowledge of

the Petters' Ponzi scheme.  Specifically, that Defendant should be precluded from testifying that

it did not know 1) about fraudulent activity on the PCI Account, 2) big-box retailers should have

been wiring money into the PCI Account, 3) big-box retailers were not wiring money into the

PCI Account, 4) Nationwide International Resources Inc. and Enchanted Family Buying

Company were purportedly the two entities PCI was buying merchandise from, and 5) the funds

in the PCI Account were supposed to be used to repay PCI's lenders.  Plaintiff believes that

prohibiting this evidence is necessary because Plaintiff would have been able to refute such

claims with the spoliated evidence.

Second, that Plaintiff should be allowed to present evidence to the jury about Defendant's

destruction of the backup tapes.

Third, that Defendant should be prohibited from objecting to the introduction of any pre-

March 2005 emails or documents produced from third parties.

Defendant argues that Plaintiff's requested sanctions are disproportionate to any

prejudice he may have suffered.  Dictating which evidence is admissible or inadmissible,

Defendant argues, would impair the jury's ability to make accurate factual determinations on the

41

central issues in this case.  Defendant asserts that such decisions amount to evidentiary rulings best left for the District Court.

The Court agrees with Defendant on this last point, the remaining evidentiary issues should be left to the trial judge as they go beyond an adverse inference.  The Court, however, believes that two of Plaintiff's three additional remedies would be appropriate, given Defendant's behavior in destroying the tapes by Defendant's employees who knew about the litigation holds.  Further, Defendant has lied to this Court and has attempted to hide evidence on several occasions.  The Court determines that the second and third alternative remedies are appropriate: that Plaintiff should be allowed to present evidence to the jury about Defendant's destruction of the backup tapes; and that Defendant should be prohibited from objecting to the introduction of any pre-March 2005 emails or documents produced from third parties.

## V.    Authority

As a final matter, Defendant challenges this Court's authority to issue an adverse inference jury instruction.  Arguing that Plaintiff's request for an adverse inference concerns the conduct and administration of trial, Defendant believes the Court should decline to decide Plaintiff's motion and allow the District Court to address it in the first instance.  As a practical matter, Defendant argues, the parties will raise the same evidentiary issues of spoliation before the District Court.  Defendant asserts Plaintiff's motion is premature and, if decided by this Court, will ultimately result in duplicative litigation.

The Federal Rules of Bankruptcy Procedure fully incorporate Federal Rule of Civil Procedure 37.[235]  Rule 37 provides federal courts with the authority to issue sanctions, including an adverse inference instruction, in the event a party fails to take reasonable steps to preserve

---

[235] Fed. R. Bankr. P. 7037.

ESI that should have been preserved in the anticipation or conduct of litigation and cannot be replaced through additional discovery.[236]   The Court's authority to impose spoliation sanctions arises from its inherent power as a federal court.[237]   "A court's inherent power includes the discretionary 'ability to fashion an appropriate sanction for conduct which abuses the judicial process.'"[238]   Several bankruptcy courts have addressed and applied adverse inferences under Rule 37 in similar circumstances.[239]

The Court is intimately familiar with the discovery record and the allegations of spoliation in this adversary proceeding.[240]   The Court has heard Defendant's false and misleading testimony and arguments.   The Court has reviewed hundreds of pages of documents in separate *in camera* reviews.   The Court has taken telephone calls to resolve disputes at depositions.   The Court has reviewed over ten formal motions to compel, resolved numerous discovery disputes on an informal basis, and has held several formal hearings regarding the backup tapes.   Judicial economy favors this Court making the findings and determination about the appropriate

---

[236] Fed. R. Civ. P. 37(e).

[237] *Stevenson*, 354 F.3d at 750; *Ramirez-Cruz*, 2017 WL 8947191, at *2 (citing *Sherman v. Rinchem Co., Inc.*, 687 F.3d 996, 1006 (8th Cir. 2012)).

[238] *Stevenson*, 354 F.3d at 745 (quoting *Chambers v. NASCO, Inc.* 501 U.S. 32, 44–45 (1991)).

[239] *In re Chung-Hwan Kim*, Adv. No. 12–2140 VFP, 2018 WL 671467, at *3, *17, *22 (Bankr. D.N.J. Jan. 31, 2018) (finding an adverse inference to be warranted and discussing the bankruptcy court's previous order granting plaintiffs' motion *in limine* for an adverse inference based on the debtor's destruction of documents under Rules 37 and 7037); *see In re Correra*, 589 B.R. 76, 135–37 (Bank. N.D. Tex. Aug. 21, 2018) (ordering debtor to produce previously unproduced documents or else appear and show cause as to why a further sanction under Rule 37(e), an adverse inference that the spoliated ESI would have been unfavorable, is not warranted); *In re Visicon S'holders Tr.*, 478 B.R. 292, 309 (Bankr. S.D. Ohio 2012) (drawing an adverse inference against the debtor-in-possession for its failure to produce documents requested during discovery); *In re Biocoastal Corp.*, 149 B.R. 212, 214 (Bankr. M.D. Fla. 1992) ("It is well established that the failure of a party to provide evidence . . . peculiarly available to that party supports the inference that the truth would be damaging to the party."); *see also In re Stillwater Asset Backed Offshore Fund Ltd.*, Adv. No. 14-02245 (MEW), 2017 WL 1956848, at *7–9 (Bankr. S.D.N.Y. May 10, 2017) (noting the bankruptcy court's ability to impose an adverse inference based on destroyed evidence but finding it would be preferable to wait until discovery is closed before determining the scope of any such inference); *In re Krause*, 367 B.R. 740, 771–72, 777 (Bankr. D. Kan. 2007) (considering an adverse inference jury instruction for spoliation but ordering the more severe sanction of partial default judgment); *see generally In re Rice*, 14 B.R. 843, 845 (B.A.P. 9th Cir. 1981) ("The Panel finds no aspect of the new Bankruptcy Code to be in conflict with the application and full implementation of the discovery rules made available under the Federal Rules of Bankruptcy Procedure . . . .").

[240] Pl.'s Mem., Dkt. 343, Stacey Decl. ¶¶ 4–5; Def.'s Resp., Dkt. 344 at 4 n.7.

43

discovery sanctions for Defendant's destruction and failure to preserve the backup tapes. In the event the District Court finds that this Court lacks the authority to issue an adverse inference instruction, the Court recommends the same.[241]

### Conclusion

Based on the record and evidence available, Defendant intentionally destroyed and failed to preserve the Minnesota email backup tapes in bad faith to deprive Plaintiff of their use in this adversary proceeding. Defendant's actions occurred after a duty to preserve relevant evidence was in place. Defendant failed to take reasonable steps to prevent the destruction—first in 2010 and 2011 and again in 2014 when the tapes were either lost or destroyed—and the information on the backup tapes cannot be restored or replaced through additional discovery. The Court finds that sanctions are appropriate under both Rule 37(e)(1) and 37(e)(2). For the reasons stated above, Plaintiff's motion is granted.

### Order

IT IS ORDERED: Plaintiff's motion is granted.


/e/ Kathleen H. Sanberg
KATHLEEN H. SANBERG
UNITED STATES BANKRUPTCY JUDGE

---

[241] Magistrate judges also make recommendations regarding spoliation. In this district, Magistrate Judge Boylan recommended that the district court instruct the jury that it may infer that the spoliated evidence would have been advantageous to plaintiffs and disadvantageous to defendants. *E*Trade Sec. LLC*, 230 F.R.D. at 592–93. Judge Kyle adopted the report and recommendation in full. *Id.* at 584; *see Moody*, 271 F. Supp. 3d at 432 (ordering an adverse instruction for spoliation); *see also Matthew Enter., Inc. v. Chrysler Grp. LLC*, No. 13-cv-04236-BLF, 2016 WL 2957133, at *5 (N.D. Cal. May 23, 2016) (ordering that if the presiding judge deems it necessary, an adverse inference jury instruction may be provided).